## THE ANNA.

### *Ex parte* WEHMANN.

### *Ex parte* COHEN.

(*District Court, D. South Carolina.* September 15, 1891.)

1. SHIPPING—NEGLIGENT LOSS OF CARGO—LIMITING OWNER'S LIABILITY.
   A vessel carrying freight ran on a snag and sank in shallow water, near the landing for which she was destined, but, after part of her cargo had been taken off, she was raised, taken to the landing, and the balance of the cargo delivered. *Held* that, in ascertaining the owner's liability under Rev. St. U. S. § 4283, providing that his liability for the loss of property shipped on the vessel shall not exceed the value of the interest in the vessel and her freight then pending, if the loss be occasioned without his privity or knowledge, the value of the vessel should be determined at the period when the voyage actually terminated, and that this was when she reached the landing, and not just after she had sunk.

2. SAME.
   In ascertaining the owner's liability in such case, he should be allowed a deduction for the expense incurred in raising the vessel.

3. SAME—INCOMPETENCY OF MASTER—KNOWLEDGE OF OWNER.
   In an action by the owner of a vessel to limit his liability for loss and damage to freight by the sinking of the vessel, under Rev. St. U. S. § 4283, on the ground that the loss was not caused with his privity or knowledge, it was shown that whisky was smelt on the breath of the master of the vessel on the morning it was sunk, and one or two witnesses testified that he was drunk on one occasion, when he was not on duty. All other witnesses testified to his general sobriety, and the owner of the vessel swore he had never known him to be drunk. Liquor was forbidden on the boat, except a small flask in bad weather. *Held*, that it was not shown that the master was an habitual drunkard, within the knowledge, or means of knowledge, of the owner.

4. SAME—SEAWORTHINESS OF VESSEL.
   In such action it appeared that the master on the morning of the disaster gave as his reason for getting ashore that the vessel was leaking, but both he and his crew afterwards testified that it was not leaking. It was shown that the owner carefully examined the vessel from time to time; that for some time he had carried rice in bulk in her hold. The shipwright who repaired the hole in her hull caused by the accident testified that she was tight, stanch, and seaworthy in other respects. After the hole was stopped, she sailed back to her dock without assistance. *Held*, that the vessel was not unseaworthy or leaky within the means of knowledge of the owner.

In Admiralty.

*J. P. K. Bryan*, for the Anna and Wehmann.

*Asher D. Cohen* and *J. E. Burke*, for McDuff Cohen.

SIMONTON, J. F. Wehman is the owner of a number of vessels of small burden plying between the city of Charleston and points on the coast of South Carolina lying on and adjacent to the bays, creeks, and estuaries penetrating that coast. Among these vessels is the schooner Anna. McDuff Cohen is a planter, cultivating a tract of land on Wadmalaw island, on the waters of Leadenwah creek. On this tract, and upon the creek, is a regular landing, at which vessels deliver their freight. In March of this year he contracted with Wehmann for the transportation of plantation supplies from Charleston to his landing on Wadmalaw island. Wehmann furnished the Anna for this purpose, and she was loaded accordingly; the freight being $60. Mr. Cohen's supplies

filled her up, so that she could not take certain freight offered by Whaley & Rivers, perhaps others, and engaged by her master, who had authority to engage freight. The Anna proceeded on her voyage with one Goodwin as her master, and reached the mouth of Leadenwah creek in safety. Here he found a bar, but, passing through a slough early on the flood-tide, the schooner went up the creek. When she had reached a point not far from Mr. Cohen's landing, she struck a snag which penetrated her bottom, filled with water, and sank in the creek. Upon the question whether this snag was exposed or concealed there is conflict of testimony. At this stage of the case it is not necessary to decide it. Her cargo was materially injured, and much of it totally destroyed. Mr. Cohen at once notified Wehmann of the disaster, and claimed damages at his hands. He afterwards instituted suit in the court of common pleas for Charleston county. Pending this suit Mr. Wehmann filed his petition in this court, seeking the limitation of liability provided in the acts of congress. This proceeding was *ex parte*, and under it an *ex parte* valuation was made of the schooner as she was at the bottom of the creek. Afterwards, upon notice, Mr. Cohen came into this court, protesting against this valuation, and denying that Wehmann was entitled, under the facts of this case, to the protection of the acts of congress. He also professed his willingness to submit his case here on the merits.

As the controlling question in this case is as to the limitation of liability of Wehmann, if he be liable, the argument at the hearing was confined to it, and only the facts bearing upon this issue will be stated. Section 4283 of the Revised Statutes provides that the liability of the owner of any vessel for the loss of any property shipped or put on his vessel should not exceed the value of his interest in such vessel and her freight then pending, if such loss be done, occasioned, or incurred without the privity or knowledge of such owner. Under the act of congress, (24 St. 80,) this section is made to apply to vessels used as the Anna was. "The object of the act of congress is to exempt owners of ships from the onerous liability to which they were held, by the common law, for the acts or neglect of their servants or agents, or of third persons, without their own knowledge or concurrence, not to diminish their responsibility by their own willful or negligent acts." *Walker* v. *Transportation Co.*, 3 Wall. 150.

The first question, therefore, is, did this loss occur with the privity or knowledge of Wehmann, through or by reason of his own willful or negligent acts? The counsel for Mr. Cohen contend that it did so occur, (1) because the vessel was unseaworthy, for the reason that her master was a drunkard, and (2) because she leaked so badly that she would not obey her helm.

To establish the first point it is necessary to prove that the master was an habitual drunkard, within the knowledge, or the means of knowledge, of Wehmann. The evidence to this point is meager. Mr. Cohen smelt whisky on him on the morning of the disaster. One or two witnesses say that on one occasion he was drunk on a visit to a plantation, but not when he was on duty. All the others speak of his general sobriety, and

Wehmann distinctly swears that he never knew him to be drunk, and that liquor was forbidden on his boats, except, possibly, a small flask in bad weather. This charge has not been made out. *Earnmoor S. S. Co.* v. *Union Ins. Co.*, 44 Fed. Rep. 374.

With respect to her leaking, the evidence is that the master gave that reason to Mr. Cohen, on the morning of the disaster, as his excuse for getting ashore. On his oath now, sustained by that of his crew, he says otherwise. Nothing could be more natural than that he should give some excuse for what seemed an act of gross carelessness. On the other hand, the evidence is that Wehmann carefully examined this vessel from time to time; that he had had her a short time before this on the ways; that she had been engaged all the winter carrying rice in her hold in bulk; and that she had safely reached, through intricate navigation, the mouth of Leadenwah creek. The shipwright who repaired the hole in her hull says that in every other respect she was tight, stanch, and seaworthy, and, as in a measure corroborative of this, the Anna, when she reached Mr. Cohen's landing, was placed on a shallow spot, the hole was stopped up, and she sailed, unassisted, back to Charleston. Counsel also contend that after Wehmann took personal charge of the Anna he so negligently conducted the unloading and raising of her that he contributed to the destruction of her cargo, and so cannot bring himself within the act of congress. The cargo consisted of hay, corn, cow-peas, phosphate in bags, guano, nitrite of soda, dried blood, cotton seed, cement, lime, terra cotta pipes, plaster of Paris, grain, bags and bagging, agricultural implements, and crates. The implements and crates were on deck; the other articles were in the cabin. The whole cargo was estimated at $816.87. The value of the phosphate, etc., in the hold is put at $569.20. When the schooner sank, the deck-load floated off, and was gathered up. It appears, therefore, that the largest part, if not all, the cargo in the vessel after she went down was of such a description that submersion in water for a night only would destroy it. The disaster occurred on 2d April; Mr. Cohen notified Wehmann on 3d. That afternoon Mr. Wehmann's son went up with Capt. Grau to the vessel, reaching the point late in the evening, and took charge the next day, 4th April. The injury had been already done. No delay in raising and no mode of discharging cargo could increase the damage. Indeed, it seems that Mr. Wehmann, when he had notice of the disaster, did all that he could. He sent at once with his son a man of skill and experience, to do all that could be done in saving his own vessel and her cargo, and he filled all the requisitions they made on him. He has brought himself within the provisions of the act, and is entitled to the limitation of liability. Assuming, for the sake of argument, that the master was grossly careless, and that but for this no disaster would have occurred, we state the very reason which induced congress to protect the ship-owner.

The next question is, at what period must the value of the vessel be determined in ascertaining the limit of his liability? All the authorities agree that this is the period when the voyage terminated. *The City of Norwich*, 118 U. S. 468, 6 Sup. Ct. Rep. 1150; *The Scotland*, 105 U. S. 24.

"If the ship is sunk or destroyed, and no freight earned, his responsibility is at an end. If either or both are saved, in whole or in part, to that extent his liability remains." *The Abbie C. Stubbs*, 28 Fed. Rep. 720. If the disaster is such as to terminate the voyage,—that is, if she be at the bottom a hopeless wreck, as was the City of Norwich, or so broken up that a few planks remained, as was the case with the Scotland,—the voyage is ended to all intents and purposes; but if, as in the case of *The Abbie C. Stubbs, supra,* she is so seriously injured by collision at sea as to be in a sinking condition, and compelled to throw cargo overboard, and run up on a beach, from which she could not be saved except by the extraordinary services of salvors, yet, if she could be gotten off, and be towed to her port of destination, and there deliver the remaining part of the cargo, the voyage is not terminated until she reached that port. The period for valuation, with reference to the owner's liability, is not the time of the accident, but the termination of the voyage. She may be injured, and go on, and be subsequently sunk before reaching her port, and totally lost. The total loss fixes the amount of the liability, although after the accident she may have had value. *The Scotland, supra.* Now the Anna had as her destination Cohen's landing, on Wadmalaw island. She sank in the creek not far from the landing. She was in shoal water, in a narrow creek, easily reached, and as easily raised with proper appliances. Her condition was in no sense hopeless, nor was she a wreck. Her only injury was a hole in her bottom, easily reached, which was reached and closed. It was Wehmann's duty to raise her, his contract to deliver cargo. He did raise her, carried her to Cohen's landing, and did deliver the balance of cargo. This he was bound to do. *The Maggie Hammond,* 9 Wall. 435; *The Niagara,* 21 How. 7. He may be allowed any extraordinary expenses incurred in accomplishing this, and from her value may be deducted the cost of closing the hole. *The City of Norwich, supra.* But it is clear from the testimony of the shipwright (an expert) that after the disaster, except for this hole, she was in every respect stanch, tight, and seaworthy. The appraisement heretofore made will be set aside. Let a proper order be taken for her appraisement as she was at Cohen's landing, with a separate statement of the cost of raising her and of the amount of freight earned.