In the Matter of the Complaint of PA-CIFIC INLAND NAVIGATION COMPANY, Inc., a corporation, as owner pro hac vice of the DIESEL TUG SHINN for exoneration from or limitation of liability.

Civ. No. 2581.

United States District Court
D. Hawaii.

Feb. 10, 1967.

Roy A. Vitousek, Jr., Honolulu, Hawaii, for plaintiff Pacific Inland Navigation Co., Inc., Pratt, Moore, Bortz & Vitousek, Honolulu, Hawaii, of counsel.

Katsugo Miho, Honolulu, Hawaii, for claimants Fong, Miho, Choy & Robinson, Honolulu, Hawaii, of counsel.

## DECISION ON CLAIMANT'S MOTION TO INCREASE SECURITY

TAVARES, District Judge.

On September 16, 1966, the Diesel Tug SHINN was proceeding from Pier 24, Honolulu Harbor, to Pier 32, Honolulu, for the purpose of refueling the Tug. In the course of the voyage the SHINN struck the Japanese Fishing Vessel KUNI MARU No. 3, hereinafter called KUNI MARU. Both vessels were dam-

aged and some injuries were sustained by the crew members of the Tug.

The owners of the KUNI MARU have claimed damage of approximately $167,-000.00.

Pacific Inland Navigation Co., Inc., hereinafter called Pacific, representing that the value of the Diesel Tug SHINN did not exceed the sum of $95,000.00 following the accident, has instituted this action for exoneration from liability or for limitation of liability under 46 U.S.C., §§ 183–189, in accordance with Rule F of the Supplemental Rules of the Federal Rules of Civil Procedure, and has filed with its complaint, a bond, to include costs in the sum of $95,250.00.

On October 31, 1966, the owners of KUNI MARU and crew members thereof filed a Motion for Increased Security.

Under this motion KUNI MARU makes three contentions regarding the effect of 46 U.S.C. § 183, which grants an offending vessel the privilege of limiting liability upon condition that the owners, pursuant to 46 U.S.C. § 185, surrender the value of their interest in "such vessel, and her freight then pending," namely:

(1) That "freight pending" includes all revenue paid which might become payable under the charter under which the SHINN was hired by Matson Navigation Co., hereinafter called Matson, or, in the alternative, such revenue as the Tug might have coming under the charter for the balance of the charter period, e. g., from September 16, 1966, to and including October 23, 1966;

(2) That the cost of the repairs to SHINN after the collision, approximating $25,000.00, should be included in determining the value of the "owner's interest"; and,

(3) That the maximum amount of the hull and machinery and public liability insurance carried by the SHINN at the time of the collision as required by the charter, should be included in determining the value of the "owner's interest."

It appears from the record that Pacific, as owner, entered into a time char-

ter party agreement with Matson as the charterer, under date of October 24, 1963, whereby the Tug WINQUATT was to be delivered to the charterer on October 25, 1963, the agreement to continue until time of redelivery at Owner's dock at Vancouver, Washington. By paragraph 15 of the agreement, the term of the charter party was expressed to be for six months from date of delivery of the tug, subject to charterer's option to renew for a further period of six months.

It is reasonably inferable that this charter was extended by mesne agreements until, by supplemental agreement of July 16, 1965, it was amended to provide for substitution of the tugboat SHINN for the O/S WINQUATT, with a substitution of rates for the use and hire of the SHINN. It was later further amended so as to provide for the following rates:

A. Per day of sea time while operating with a barge in tow, $1,325;

B. Per day of sea time while operating without a barge in tow, $1,-235.00;

C. Per day of standby time or lay time, at $985.00;

and to extend the term thereof to and including October 23, 1966.

Under paragraph 8 of the charter party it was provided that,

"In the event of loss of time from deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment, unintentional grounding, detention by average accidents, drydocking, or by any other cause under Owner's control preventing the full working of the Tug in excess of 24 continuous hours, the payment of hire shall cease for the time thereby lost."

Immediately following the accident on September 16, 1966, the SHINN made fast to Pier 32 at 11:35 a. m., and departed therefrom to dry dock for repair at 1:20 p. m. on the same day. The record does not reveal the date when drydocking and repairs were completed.

No cases have been cited by either side, nor has the Court found any case

directly in point upon the contention of the claimant to the effect that under such a charter the SHINN was on a six months "voyage" and that "freight pending" should include the total amounts which the tug earned or might earn during the entire charter period, or at least during that portion of the charter period from September 16, 1966, the date of the accident, until October 23, 1966, the terminal date of the charter party as amended.

The original charter party had reference to the Tug O/S WINQUATT. The amendment of July 16, 1965, authorized a substitution of SHINN for the O/S WINQUATT. The later, undated amendment also authorized such substitution and extended the term of the charter party to and including October 23, 1966. In the event that SHINN was actually in substitution as the October date approached, the plaintiffs would have been obligated to return her to Vancouver. However, there is nothing in the record to prevent the resubstitution of the WINQUATT under the charter party at any time subsequent to September 16, 1966. Claimant's contention, if carried to its logical conclusion, would require the total earnings under the charter party and all of its extensions to be included as "freight pending" irrespective of which tug provided service to plaintiff. However, claimant only contends for the inclusion of the "total earnings of the Tug SHINN during the six months of the alleged Time Charter Agreement and any extension thereof, or, in the alternative, its total earnings during the period September 16, 1966, to and including October 23, 1966."

No facts whatever have been presented as to the period or periods of employment of SHINN. From the record as it stands, no showing whatever has been made regarding substitutions or the periods thereof. Nothing appears in the record from which the Court could make a determination as to the earnings of SHINN under the charter. Should the alternative be selected as a basis of calculation, the Court has no way of knowing that the WINQUATT was not substituted for the SHINN immediately following the accident. For all that the record discloses, September 16, 1966, may have been the day upon which SHINN was first substituted for the WINQUATT. The Court does not believe that the term "freight pending" was ever intended to be subjected to such vagaries.

The utility of a tug is certainly different from that of other types of vessels. Certain types of tugs, by their very nature, are designed to tow. They earn by what they tow, rather than by what they carry as freight.

As we might well expect, it has been said that:

" * * * In the case of a flotilla consisting of tug and tow, the vessel required to be surrendered will, in some circumstances, be only the tug, as in Liverpool, etc., Nav. Co. v. Brooklyn Eastern Dist. Terminal, 251 U.S. 48, 40 S.Ct. 66, 64 L.Ed. 130, while in other circumstances it will be the whole flotilla. The Columbia, 73 F. 226 (C. C.A.9), approved in Sacramento Nav. Co. v. Salz, 273 U.S. 326, 332, 47 S.Ct. 368, 71 L.Ed. 663.",

In Re W. E. Hedger Co., Inc. (2 Cir. 1932), 59 F.2d 982, re the steam tug Frederick Lennig.

In the instant case the Tug SHINN was not under tow at the time of the collision with the KUNI MARU. Hence we are not called upon to consider whether a tow or tows should be included in the limitation fund. By the terms of the contract under which the SHINN was operating, it was clearly contemplated that she was to be employed for the purpose of towing. The contract established different rates of compensation to the owners in accordance with her use.

In the case of The William J. Riddle, (U.S.D.C.N.Y.1953), 111 F.Supp. 657, a U. S. Government owned vessel was involved in collision with another vessel under conditions establishing U. S. liability. The U. S. ship had been specially fitted to take horses to Poland and to

return the handlers back to the United States. The handlers were carried back, at a fixed fare, their round trip passage having been paid in advance. The fitting out of the ship did not indicate any expectation of other return cargo. The rates had been calculated upon the assumption of an empty return trip. The court found that the voyage upon which the ship was embarked was from the United States to Poland and return. The decision turned upon the factual situation.

In The LA BOURGOGNE, also cited as Deslions v. LaCampagnie Generale Transatlantique, 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973, a French passenger liner made regular trips back and forth between New York and Havre, and was on an eastbound trip when she was hopelessly damaged and sank within a short time, taking most of the passengers, her captain, other officers, and many of the crew down with her. The owners had a mail subsidy contract under the French Government, providing for fifty-two trips a year. The lower courts had included ½₂nd of the annual proceeds in the limitation fund, but the Supreme Court rejected this item on the ground that there was no way to accurately compute what portion might be attributed to any particular trip. The case again turned upon the factual situation. Each trip eastward and each trip westward was deemed to be a separate voyage for the purpose of determining the "freight pending."

In The BLACK EAGLE, 2 Cir., 87 F. 2d 891 (1937), the BLACK EAGLE was on a voyage from Rotterdam, Holland to New York when she collided with another vessel, resulting in the total loss of the latter, together with her cargo. The owners held a mail contract with the United States Government for carrying mail on eastbound voyages. The only obligation on return trips was to carry undelivered parcel post mail, military and naval mails and mail bags "all without additional charge." Payments to the owners were measured by the mileage on the eastbound trips. The court held that no part of the mail contract earnings was to be included in the limitation fund, as the westward trip constituted a separate voyage so far as freight pending was concerned.

■ By analogy, it appears that the agreement between Pacific and Matson was one which contemplated a series of separate and distinct voyages, in the course of which distinct towing services would be performed by whichever tug happened to be assigned to the voyage by the owner. At the moment of the accident the SHINN was not under tow, nor was she engaged in any towing voyage. For this reason and those set out above, the Court is compelled to hold that the total earnings of the tug SHINN during the six months of the extended charter period cannot properly be included in the limitation fund as "freight pending."

This being so, the alternative claim that the total earnings during the period from September 16, 1966, to and including October 23, 1966, should be so included, must also be rejected.

The remaining contentions of the claimant are likewise denied.

■ The contention that repairs, at an approximate cost of $25,000.00 have increased the value of the SHINN since September 16, 1966, would possibly merit consideration only if this Court were to conclude that the SHINN's voyage did not terminate until October 23, 1966, a proposition which is denied supra.

The case of THE ANNA, 47 F. 525 (D.C.S.C.1891), cited by claimants, does not support their contention. There it was held that the voyage was terminated at the dock after the vessel had been repaired and raised, but the owner was allowed to deduct his costs of so doing. See also Norwich N. Y. Trans. Co. v. Wright, 80 U.S. 104 (13 Wall.), 20 L. Ed. 585 (1872); Gilmore & Black (1957) Sec. 10–29, pp. 711–712; Rice Growers' Ass'n of California v. Rederiaktiebologet Frode (THE FREJ), 9 Cir., 176 F.2d 401 (1949).

The other contention of claimants, e. g., that the security posted should be increased to include some portion of the hull and machinery insurance coverage together with personal injury liability insurance sufficient to cover the claimant's claims, is not tenable.

As to the hull insurance, the Supreme Court in "THE CITY OF NORWICH," infra, by a five-to-four decision, held that the value to be considered in determining the amount of the limitation fund should be the value of the vessel in the market and that insurance payments to the owner after a marine disaster are not included in the limitation fund. Petition of Sheridan, 226 F.Supp. 136 (D.C.S.D. N.Y.1964), THE CITY OF NORWICH, 118 U.S. 468, 6 S.Ct. 1150, 30 L.Ed. 134, (1886), 3 Benedict on Admiralty, 6th Ed., Sec. 502, p. 452; The Law of Admiralty, Gilmore and Black, Chapter X, Sec. 10–30, pp. 712–713. THE NORWICH case, and companion cases have stood as the law since they were decided in 1885.

Questions involving the application of personal injury liability insurance have posed some perplexing problems. Suffice it to say that Hawaii does not have a direct action statute like Louisiana's, hereinafter mentioned. No authority is cited wherein this type of insurance has been held includable in the limitation fund in the absence of such a statutory provision.

Claimants have cited In Re Independent Towing Company, 242 F.Supp. 950, D.C.E.D.La., (1965) as supporting their position. That case was under Louisiana's direct action statute and is not in point, in that, among other things, no personal injury claims appear to have been made herein and Hawaii has no direct action statute even remotely comparable to Louisiana's. The difficulty of attempting, by case law, to solve questions in this field is illustrated by the conflicting opinions in Maryland Casualty Co. v. Cushing, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954), and see also The Law of Admiralty, Gilmore and Black, Sec. 10–31, pp. 714 to 715, and 3

Benedict on Admiralty, 6th Ed., pp. 452, 453.

It may be that there is a need to re-examine and liberalize the owner-oriented rules in this field, but this can more safely and adequately be accomplished by legislation based on nation-wide and international studies of the problem, and with provision for prospective application sufficiently in advance not to cause major disturbances in the whole field of marine insurance, rather than by chipping away piece-meal at the problem by occasional court decisions on a case-by-case basis.

For the foregoing reasons, claimants' Motion for Increased Security is hereby denied.