In re J. Lewis **MOORE** and Olive L. Moore,
d/b/a Moore Towing Company, as char-
terers, and Mobil Oil Corporation, as
owner of the TUG **OLIVE L. MOORE.**

Civ. A. No. 29397.

United States District Court
E. D. Michigan, S. D.

Jan. 9, 1968.

John L. Foster, Foster, Meadows & Ballard, Detroit, Mich. for Mobil Oil Corp.

David G. Davies, Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio for J. Lewis Moore and Olive L. Moore, d/b/a Moore Towing Co.

William D. Carle, McCreary, Hinslea & Ray, Cleveland, Ohio for Huron Cement Division, National Gypsum Co.

## OPINION

FREEMAN, Chief Judge.

This is a motion of Huron Cement Division, National Gypsum Company, for dismissal as to it of a complaint by the owner and the charterers of the Tug Olive L. Moore, seeking limitation of liability.[1] Plaintiffs' allegations, which, for present purposes, must be considered true, indicate that on May 4, 1966, the Moore departed Chicago en route through the Great Lakes system to Rockland or

---

1. These portions of the federal limitation legislation are pertinent to this opinion:

46 U.S.C. § 183(a)

"The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not * * * exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

46 U.S.C. § 185

"The vessel owner, within six months after a claimant shall have given to or filed with such owner written notice of claim, may petition a district court of the United States of competent jurisdiction for limitation of liability within the provisions of this chapter and the owner (a) shall deposit with the court, for the benefit of claimants, a sum equal to the amount or value of the interest of such owner in the vessel and freight, or approved security therefor, and in addition such sums, or approved security therefor, as the court may from time to time fix as necessary to carry out the provisions of section 183 of this title, or (b) at his option shall transfer, for the benefit of claimants, to a trustee to be appointed by the court his interest in the vessel and freight, together with such sums, or approved security therefor, as the court may from time to time fix as necessary to carry out the provisions of section 183 of this title. Upon compliance with the requirements of this section all claims and proceedings against the owner with respect to the matter in question shall cease."

46 U.S.C. § 184

"Whenever any such embezzlement, loss, or destruction is suffered by several freighters or owners of goods, wares, merchandise, or any property whatever, on the same voyage, and the whole value of the vessel, and her freight for the voyage, is not sufficient to make compensation to each of them, they shall receive compensation from the owner of the vessel in proportion to their respective losses; and for that purpose the freighters and owners of the property, and the owner of the vessel, or any of them, may take the appropriate proceedings in any court, for the purpose of apportioning the sum for which the owner of the vessel may be liable among the parties entitled thereto."

46 U.S.C. § 186

"The charterer of any vessel, in case he shall man, victual, and navigate such vessel at his own expense, or by his own procurement, shall be deemed the owner of such vessel within the meaning of the provisions of this chapter relating to the limitation of the liability of the owners of vessels; and such vessel, when so chartered, shall be liable in the same manner as if navigated by the owner thereof."

The effect of granting Huron's motion for dismissal would be to permit it to bring an independent action and pursue its claim described in the text to the full extent of its value.

As is customary in cases of this kind, with respect to at least some of the demands filed against the Moore, plaintiffs also seek complete exoneration from liability on the theory that the tug was not legally at fault. However, this aspect of the matter is of no present concern.

Parker Flats, Maine, pushing a barge belonging to a third party, loaded with shelled corn. About 24 hours after breaking ground, the captain, Randolph Lewis, sensing a storm in the making, decided to bring the barge astern and pull it. During maneuvers to achieve this realignment, the two craft collided, and the Moore began taking on water in excess of pumping capacity. Lest she sink, he ordered her beached.

Eventually refloated and towed along with the barge to Muskegon on the west coast of Michigan, the tug put up for more than five weeks while her hull and engines were repaired. Toward the end of this period, Huron, in a gesture of fellowship which it had since come to regret, gave permission for the use of one of its piers for carrying out dock trials on the Moore. The upshot of the tests was the collapse of a number of pilings supporting the pier and total damage estimated at $75,000.

Four days later, after a letter of undertaking offered on behalf of plaintiffs on account of this injury had been accepted by Huron, the offending vessel, still destined for Maine, left Muskegon with the grain. She never made it. Her engines went dead on June 23 in the Straits of Mackinac and could not be restarted. She was brought to Cheboygan, Michigan, where new arrangements were completed for getting the corn East. Thereafter, this litigation began, and the tug was turned over to a trustee who, with considerable effort, managed to sell her for $16,100. On the other side of the ledger, approximately three dozen parties including the cement company have entered demands totalling a quarter of a million dollars.

The first reason assigned by Huron for dismissal is that in its estimation this case is concerned with only the creditors holding claims connected with the Moore's passage from Muskegon to the Straits, a category which, it assumes, excludes itself. To arrive at this position, the movant works from three premises: First, a number of decisions, of which *The Alpena*, 8 F. 280 (N.D.Ill. 1881), is probably the most well known, say that a shipowner can limit in any one action no debts other than those incurred during or in furtherance of the "voyage" most recently antedating his petition. Second, this rule should apply as well to "incidents" between voyages, so that where a chain of events of either or both types preceded filing, only liabilities associated with the latest of the series can be restricted. Third, on the present facts, the course from Chicago to the Straits must be broken down into two voyages—from the Illinois port to Muskegon and from that community north—and one intervening incident, the dock accident. In analyzing this argument, attention can most economically be devoted initially to the meaning of the term employed in *The Alpena*; for, obviously, if everything which took place between May 4 and June 23 happened as a part of a unitary voyage, Huron's ultimate contention is without foundation.[2]

Neither the keystone of the Act of March 3, 1851, nor its present version, 46 U.S.C. § 183(a), the pivotal provision here, uses the controversial word; and a vessel need never have plied the waves in order to take advantage of the legislation. Lehigh Valley R. R. v. Jones, 50 F.2d 828 (3d Cir. 1931). However, the statute has always said that an owner's responsibility will not exceed the value of his interest in his ship and pending freight. The voyage concept was introduced as a factor in determining this amount. In Norwich & New

2. Huron has not indicated what should be done with other, albeit minor, claims which arose during the lay-over in Muskegon. Logically, under the multiple-voyage concept it proposes, each would have to be treated as incurred during a separate incident, unless they could be lumped together and seen as attributable to preparations for the "second voyage" from Muskegon to the Straits and thus associated with it. Whether the latter approach is proper and, more significantly, whether the dock trials could be seen in the same light are questions which the present disposition renders moot.

York Trans. Co. v. Wright, 80 U.S. (13 Wall.) 104, 20 L.Ed. 585 (1872), the Court discussed at length the formulae for appraisal then existing under comparable Civil and English laws, noting that the latter differed from the former by commanding, as a prerequisite to invocation, a deposit with the admiralty tribunal equal to the worth of the craft as it stood immediately *prior* to the disaster which triggered the desire to seek limitation. Selecting the one which seemed more harmonious with congressional design, the Court opted for the Continental approach expressed, among other places, in the Maritime Ordinance of Louis XIV:

> The proprietors of vessels shall be responsible for the acts of the master, but they shall be discharged by *abandoning* the ship and freight. (Emphasis supplied.)

Although the post-misadventure norm was thus established, refinement was necessary. Fourteen years later, when another suit growing out of the same collision came before him, Justice Bradley was more specific regarding the reference point for computation:

> Section 4283 [as amended, 46 U.S.C. § 183] declares that the liability of the owner of any vessel [for, *inter alia,* embezzlement, loss, destruction and collision] shall 'in no case' exceed the value of his interest in the vessel and her freight then pending. When it says 'in no case,' does it mean that for *each case* of 'embezzlement, loss, destruction, collision,' etc., happening during the whole voyage, his liability *may* extend to the value of his whole interest in the vessel? Twenty cases might occur in the course of a voyage, and all at different times. \* \* \* Pending freight is of no value to the

shipowner until it is earned; and it is not earned, if earned at all, until the conclusion of the voyage. Does this not show that every 'case' in which the principle of limited liability is to be applied means every voyage? We think it does. It seems to us that the fair inference to be drawn from section 4283 is that the *voyage* defines the limits and boundary of the *casus* or case to which the law is to be applied.[3] City of Norwich, 118 U.S. 468, 6 S.Ct. 1150, 30 L.Ed. 134 (1886).

He then held that the relevant valuation time is the end of the voyage, whenever or wherever that might be. Ibid.

■■ The most enlightening subsequent opinions in the area have been written in response to an objection of a claimant that the money or property before the court for distribution to creditors was inadequate because it reflected the worth of a bottom at a moment other than that which was actually the conclusion of the trip. While the instant motion does not attack the sufficiency of the fund created by the sale of the Moore,[4] the crucial underlying issue, voyage identification, is identical, and the teachings of these authorities are pertinent—in particular the principal lesson, stated succinctly in In re La-Bourgogne, 117 F. 261 (S.D.N.Y.1902): "'Voyage' is a term of recognized meaning in common parlance, and has received a legal interpretation accordingly." Another doctrine implicit in the rationale of the *City of Norwich* and applied in a companion case deserves emphasis: A voyage is not necessarily terminated by the occurrence of a mishap, and the rights of an owner are in no way diminished if as it progresses another misfortune befalls him. See The Great Western, 118 U.S. 520, 6 S.Ct. 1172, 30 L.Ed. 156 (1886).

---

3. The Court also observed that the portion of the limitation statute which is now 46 U.S.C. § 184 (see note 1 supra) clearly suggests that a voyage is the appropriate limitation unit.

4. However, in a companion motion, Huron does argue that if dismissal is not in order, the Moore should be reappraised to reflect her value on June 17, 1966, the date of the dock incident. Because the court believes, for reasons discussed in the text, that she was at that time on a voyage which was not to end until June 23 in the Straits of Mackinac, this request must be denied.

Neither Huron's brief nor independent research has disclosed any precedent suggesting that a journey is over because a boat is berthed for mandatory repairs, where, as here, she sets out again bound for her original destination, having all the time refused to relinquish the shipment entrusted to her. On the other hand, there is much pointing the other way. If following trouble at sea the ship resets her sail, the venture continues until she makes the intended final harbor, forsakes it, or suffers another calamity causing real or practical destruction. See The Great Western, supra; The C. F. Coughlin, 25 F.Supp. 649 (W.D.N.Y.1938). The steps required to allow her to pick up her travels are irrelevant. Thus, while she may have to jettison cargo, be refloated, and proceed under tow, she is still on a single voyage. See The Abbie C. Stubbs, 28 F. 719 (D. Mass.1886). Likewise, it is of no consequence that a steamer sustains a gash which would prove fatal unless patched, if, in fact, it is. See The Anna, 47 F. 525 (D.S.C.1891).

■ The case at hand is distinguishable from *Stubbs* and *Anna*. The Moore was brought to shore for remedial action, remained there for several weeks before heading back to open water, and occasioned the harm for which Huron seeks compensation during this interval. However, none of these factors is of legal significance. The overhaul at the edge rather than in midstream is a formal variation on the theme of these decisions which does not urge a substantial change in the pattern of their results by severely circumscribing the privilege and duty of a skipper in distress to do what he conceives to be best for his employer and consignments. The same must be said of the length of the pause. Although when the tug sought refuge she was disabled and unfit for commerce, she could hardly have been mistaken for a wreck. Compare The Anna, supra. Because no alternate means of propelling the barge was attempted prior to June 23, the master clearly had not despaired of going on to Maine. The dock trials did not dampen his optimism, nor have any important effect upon his ability to get there.[5] Indeed, to find that this casualty is influential would be to reject with a vengeance the deeply rooted notion that not every ill wind spells doom. The layman and the old salt alike would see the stop at Muskegon as a temporary delay, an unwelcome setback to be sure, but not the desinence of a voyage. See The Lara, 1947 A.M.C. 27 (S.D.N.Y.1946). So, too, does this court.

Huron supplies a number of citations in support of its contention that the pier incident is a distinct limitation period separating two individual voyages. None is persuasive. Several involve floating platforms which rarely even moved let alone navigated; e. g., Patton-Tully Trans. Co. v. Turner, 269 F. 334 (6th Cir. 1920). Some deal with craft, which, when disaster struck, were in dry dock for conversion or to wait out the winter without either freight or any port of call; e. g., In re Great Lakes Transit Corp., 53 F.2d 1022 (N.D.Ohio 1931). Another, Hockley v. Eastern Trans. Co., 9 F.Supp. 411 (D.Md.1935), concerned with the sinking beyond salvage of one of a string of barges, is inapposite, for the outcome depended upon the belief that each barge in such a flotilla, together with the source of motorpower, was a single vessel which would be destroyed by going under.[6]

5. It appears from the complaint that the wash from the Moore's main propulsion engine caused the collapse of Huron's pier pilings. Nothing in the record indicates that the tug was damaged in any way by this event.

6. Huron also places heavy reliance upon The Rose Culkin, 52 F. 328 (S.D.N.Y. 1892). The movant stresses the court's extensive discussion pointing out that following a marine misfortune an owner cannot continue to navigate his vessel in such a way that her value diminishes, and then surrender her for limitation purposes, seeking to restrict the claims arising from the earlier mishap. The opinion is of no help, however, for the subsequent sailing with which the court was

Undoubtedly, apart from an actual or constructive total loss situation, quitting is a matter of choice. However, the option lies not with a claimant, but with the proprietor and his agents. Except insofar as a hull is tied down by judicial order, they alone have the power to forge on or to cease. See Norwich and New York Trans. Co. v. Wright, supra. Sometimes creditors stand to gain where, despite one instance of bad luck, the trip is completed, carriage income earned, and the limitation fund thereby increased. On the other occasions, a second and even more serious adversity may arise, and they will be disappointed. Nevertheless, while the determination whether or not to advance unquestionably concerns them, it is not theirs to make. Huron may be better off now had Captain Lewis given up at Muskegon. He could have, but preferred not to. Faced with nothing but the assertions in the complaint, the court cannot say that his election was legally ineffective.

The final feature differentiating this matter from *Anna* and *Stubbs* brings to a head an issue apparently not previously passed upon: the effect of the letter of undertaking provided before the Moore reached the Straits. The document, signed by her insurers, is in customary form, promising that in consideration for Huron's refraining from attaching the tug or other property of her owners, they will appear in a stipulated forum to defend, without waiving any substantive rights, whatever lawsuit the firm might start in response to the pier episode and will pay up to $30,000 on a final judgment.[7] According to the movant, this contractual commitment allows it to press its claim for this amount independently of these proceedings.

Huron reasons that it should be in no worse posture as the beneficiary of a letter of undertaking than it would have been had the marshal, at its insistence, executed a warrant against the Moore at Muskegon. What makes this attractive proposition inconclusive is the inability of its proponent to demonstrate rather than speculate that its present position truly is inferior. If process had been served, limitation relief would nevertheless be available. See The Benefactor, 103 U.S. 239, 26 L.Ed. 351 (1880). Earlier creditors of the same voyage would still be rivals for the fund and the pro rata allotment decree of 46 U.S.C. § 184, if applicable, would have to be honored. Unlike attachment or garnishment at law, a seizure pursuant to an admiralty libel in rem does not create a lien, but only initiates the procedure for enforcing an already existing encumbrance, such as one stemming from a maritime tort. Clyde-Mallory Lines v. The Eglantine, 317 U.S. 395, 63 S.Ct. 294, 87 L.Ed. 355 (1943); Garcia Leon v. Galceran, 78 U.S. (11 Wall.) 185, 20 L.Ed. 74 (1871). Thus, it does not fix any kind of priority.[8] See The Lady Boone, 21 F. 731 (E.D.Ark.1884); City of Tawas, 3 F. 170 (E.D.Mich.1880). If Huron lost anything worth mentioning by foregoing arrest, it must have been the right to bring the voyage to an end thereby preventing the further accumulation of debts and possible diminution of the tug's value. However, this it never had in the first place.

A writ conveys no proprietary or possessory control to the one who has it

---

7. This amount was slightly higher than the estimated value of the Moore at the time of the Muskegon accident.

concerned occurred in the course of *"a number of voyages* between New York and Rockaway during about seven weeks prior to the filing of the petition to limit liability, with the offer to surrender the vessel; this being nearly four months after [the accident]." 52 F. 331. (Emphasis supplied.) Nothing in the decision purports to shed any light on the important question here: when a voyage ends.

8. Huron has not discussed the effect of the letter of undertaking upon its tort lien against the Moore, nor, if the present motion is denied, whether it believes itself entitled to any priority in the distribution of the proceeds of her sale. Indeed, it would be premature at this time to become entangled in these problems.

issued. See 2 Benedict, Admiralty § 297 (6th ed. 1940). More important, while the court does get custody, a vessel can easily escape. By the simple expedient of posting the bond described by 28 U.S.C. § 2464 or providing the appropriate stipulation authorized by Supplemental Admiralty Rule E, an owner can obtain her release and use her as he pleases. Whether the Moore would have been bailed is a question which no one can answer definitively. In any event, a reply, regardless how accurate, would really be superfluous. The letter of undertaking is still viable and assures Huron, unlike other claimants, reimbursement in accordance with its conditions should the hearing on the merits reveal the company's demand to be of a type not susceptible to restriction. See Huasteca Petroleum Co. v. Cia. de Navegacao Lloyd Brasileiro, 297 F. 318 (E.D. N.Y.1924). The objective now is not to unravel a hypothetical out of the past and permit a party to select the best aspects of what is together with what might have been. He must live with the circumstances as he finds them. It is enough only to note that in light of Section 2464 and Rule E, a formal levy does not, as a matter of law, close a voyage precisely because it may not have this effect in practice, and on the basis of this observation to hold that neither does an opportunity to seize voluntarily surrendered.

Huron has to some degree bathed its written and oral presentation in unjustified emotion by urging that unless it prevails, the faith of the marine industry in letters of undertaking will be shatttered. Such an aftermath of today's ruling is hard to envision. The advantages of these extrajudicial arrangements are too great. While they allow the shipowner to generate revenue without hiring sureties, they guarantee that the creditor, if victorious in the ensuing trial, will not see his award diminished by wharfage fees, or, if unsuccessful, will not be taxed with the expenses of keeping the boat or reimbursing the owner for premium payments if a bond is furnished. See generally 28 U.S.C. § 1921; New York Dock Co. v. The Poznan, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927); 6 Moore, Federal Practice ¶ 54.-77 [8] (2d ed. 1966). At the same time, they offer security which no watercraft is able to afford. Depreciation, deterioration, and fortuitous destruction are unknown.[9] Unlike his counterpart who looks to the fruits of the sale of a vessel, the obligee of a contract cannot be made to share its proceeds with co-equal or preferred lienors. Compare Hawgood & Avery Transit Co. v. Dingman, 94 F. 1011 (8th Cir. 1899), with Crabtree v. The Julia, 290 F.2d 478 (5th Cir. 1961).

In the final analysis, acting by writ is a course beset by some danger which is obviated by a letter of undertaking. Unless his promisor is of dubious solvency, the risks assumed by the recipient are minimal. In order to be defeated, he must gamble both on a craft which will subsequently but on the same voyage encounter difficulty of proportions sufficient to precipitate resort to the limitation statute, as well as on an owner who would be willing to let his property lie idle. Given historical experience with these variables, probability theory alone proclaims as largely groundless fears that this court's position will make these compacts obsolete.

Huron's motion could be granted only by overlooking settled law regarding the voyage concept or by modifying it to say that a voyage automatically ends upon arrest and treating a substitute for detention equivalently. The former avenue is sealed for reasons too plain to deserve exposition. The latter is inaccessible because Section 2464 and Rule E, in enabling process to be set

9. Of course, the possibility that the security value of a large vessel will be diminished while she lies under process or be eaten up to any significant extent by maintenance costs is extremely remote.

On the other hand, so too is the likelihood that the owner of a big boat will not effect her release from the marshal's custody.

aside, evidence a policy to the contrary. Those who see a tinge of unfairness in the present disposition would do well to recall that achieving what in other contexts might be deemed substantial justice did not motivate the legislators who devised the limitation measure. Its purpose remains what it was over a century ago when the hope of creating a more favorable climate in which American maritime interests could compete with those in Europe forced its passage: to guarantee within its terms that on any one trading mission a shipowner would not have to chance more than his investment and anticipated profits. See 3 Benedict, op. cit. supra § 477.

The motion to dismiss the limitation proceedings as to Huron is denied. An appropriate order shall be submitted.