OLD KENT BANK v SOBCZAK

Docket No. 214459. Submitted February 1, 2000, at Grand Rapids. Decided
    October 24, 2000, at 9:00 A.M.

    Old Kent Bank brought an action in the Kent Circuit Court against
Michelle Sobczak and Timothy J. Obetts, seeking a declaration that
the plaintiff, in repossessing the defendants' boat while it was in
the Bahamas, acted within its rights under the ship mortgage agree-
ment between the plaintiff and the defendants. That agreement
obligated the defendants not to "remove the vessel from the limits
of the United States save on voyages with the intent of returning
. . . . " The agreement further provided that if the defendants
defaulted on the mortgage, the plaintiff could retake the vessel
without legal process at any time and wherever it may be. The
court, Donald A. Johnston, J., on cross-motions for summary dispo-
sition, granted summary disposition for the plaintiff after framing
the key issue as whether, at the time the plaintiff repossessed the
boat, the boat was on a voyage with the defendants having the
intent of returning to the United States, and after finding that the
boat had not been on such a voyage. The defendants appealed.

    The Court of Appeals *held*:

    The plain language of the mortgage agreement indicates that the
parties agreed that the boat could not leave the United States
except on voyages made with the intent of returning to the United
States. Therefore, it was the conditions surrounding the removal,
not whether the boat remained on a voyage, that determines
whether the defendants defaulted. It is not disputed that the defen-
dants intended to return to the United States at the time they
started their voyage to the Bahamas. Thus, the defendants did not
default on the mortgage and are entitled on remand to an order of
summary disposition in their favor.

    Reversed and remanded.

CONTRACTS — JUDICIAL CONSTRUCTION — SUMMARY DISPOSITION.

    The primary goal in the judicial construction of a contract that is dis-
puted in an action is to determine and enforce the parties' intent; if
a word or phrase is unambiguous and no reasonable person could
differ with respect to application of the term or phrase to undis-

puted material facts, then the court should grant summary disposition to the proper party (MCR 2.116[C][10]).

*Rhoades Law Office* (by *Peter D. Rhoades*), for the plaintiff.

*Prasher Law Group, PLC* (by *Gregory G. Prasher*), for the defendants.

Before: FITZGERALD, P.J., and SAAD and WHITBECK, JJ.

WHITBECK, J. Defendants Michelle Sobczak and Timothy Obetts appeal as of right the trial court's order granting plaintiff Old Kent Bank (the Bank) summary disposition pursuant to MCR 2.116(C)(8) and (C)(10), effectively affirming the Bank's decision to repossess their boat pursuant to a preferred ship mortgage (the ship mortgage). We reverse and remand.

I. BASIC FACTS AND PROCEDURAL HISTORY

On July 24, 1996, Sobczak and Obetts purchased a forty-four-foot 1995 Sea Ray boat. They borrowed $372,016.05 from the Bank to finance this purchase and executed the ship mortgage on the boat and a second mortgage on their home to secure the loan. As is relevant to this case, Article I, ¶ 4 of the ship mortgage provided:

> Owner shall comply with and not permit the vessel to be operated contrary to any provision of laws, treaties, conventions, rules, regulations or orders of the United States, any State and/or any other jurisdiction wherein operated, and/or of any department or agency thereof, *nor remove the vessel from the limits of the United States save on voyages with the intent of returning,* nor abandon the vessel in any foreign port. Owner shall do everything necessary to estab-

lish and maintain the mortgage as a FIRST PREFERRED MORT-
GAGE on said vessel. [Emphasis added.]

If Sobczak and Obetts defaulted on the ship mort-
gage, the Bank had the right to "[r]etake the vessel
without legal process at any time wherever the same
may be" pursuant to Article II, ¶ 1(c).

Initially, Sobczak and Obetts docked the boat in
Spring Lake, Michigan. However, in October 1996,
they took the boat to Panama City Beach, Florida,
where they used it to make local trips for the better
part of the next year. In August 1997, Sobczak and
Obetts hired Captain Terry McGowan to take them on
a trip to the Bahamas. According to McGowan and
Obetts, when they left Florida in the boat, they only
intended to stay in the Bahamas for a short time
before returning to Florida or Michigan.

Sobczak, Obetts, and McGowan arrived in Freeport,
Bahamas, on September 1, 1997, and moored the boat
at the Port Lucaya Marina. However, soon after they
arrived, Sobczak received a telephone call summon-
ing her home to Michigan because her mother had
been hospitalized unexpectedly. Because this situa-
tion was, apparently, an emergency, Sobczak and
Obetts flew home to Michigan, rather than taking the
time to travel home in the boat. They arranged to
leave the boat at the marina in the Bahamas until
they could transport it back to Florida or Michigan.

Neither Sobczak nor Obetts was qualified to cap-
tain the boat from the Bahamas to the United States.
As a result, Obetts attempted to hire Dennis Grieve, a
Michigan citizen who evidently has some qualification
to captain a boat, to bring the boat back to Michigan.
They could not, however, start the boat trip back to
the United States until spring 1998 because of inclem-

ent weather. While the boat was still in the Bahamas, Sobczak and Obetts contemplated selling it to avoid the cost of returning it to Michigan and, perhaps, to purchase a larger boat. Despite these plans to buy another boat, and having made an offer to sell the boat, they continued to make the payments on the boat loan.

Sobczak and Obetts returned to the Bahamas in February 1998. On February 26, 1998, before Grieve had an opportunity to take the boat back to Michigan and before Sobczak and Obetts could sell it, the Bank repossessed it. Sobczak and Obetts had made all their loan payments and, in their view, they had not defaulted under any of the other conditions in the ship mortgage when the Bank repossessed the boat.

Back in Michigan, the Bank instituted an action concerning Sobczak's and Obetts' business loans, which they had personally secured. As part of that action, the Bank asked the trial court for a declaratory judgment that it acted properly when it repossessed the boat and that it could sell the boat. At the same time, Sobczak and Obetts filed a claim against the Bank. The parties stipulated to dismiss all the claims against each other without prejudice except the claim concerning the Bank's right to repossess the boat.

The Bank and Sobczak and Obetts filed cross-motions for summary disposition[1] of the remaining repossession claim. At the hearing for summary disposition, the trial court framed the issue as whether, *at the time the Bank repossessed the boat*, it was "on

---

[1] Sobczak and Obetts did not specify which subsection of MCR 2.116(C) supported summary disposition in their favor.

a voyage with the intent of returning to American waters." The trial court then proceeded to analyze whether the boat could still be on a "voyage" even though it had been moored in the Bahamas for more than five months before the Bank repossessed it. The trial court concluded that although "voyages may occasionally be interrupted by unforeseen emergencies, as long as the voyage is then taken up again at the first available time subsequent to the passage of the emergency, it is nonetheless a continuous voyage." The trial court, however, determined that the boat was no longer on a voyage and, therefore, Sobczak and Obetts had defaulted on the ship mortgage, entitling the Bank to repossess the boat. The trial court granted summary disposition in the Bank's favor pursuant to MCR 2.116(C)(8) and (C)(10). The sole issue on appeal is whether the trial court erred in granting the Bank's motion for summary disposition.

## II. THE GRANT OF SUMMARY DISPOSITION AND THE SHIP MORTGAGE

### A. STANDARD OF REVIEW

Whether a trial court properly granted or denied a motion for summary disposition is a question that this Court reviews de novo. *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998). Similarly, we review questions involving contract construction de novo. See *Henderson v State Farm Fire & Casualty Co*, 460 Mich 348, 353; 596 NW2d 190 (1999).

B. LEGAL STANDARDS

The trial court granted summary disposition under MCR 2.116(C)(8) and (C)(10). However, the analysis it employed indicates that it actually granted summary disposition solely under MCR 2.116(C)(10) because it closely examined the factual support for the repossession claim rather than restricting its reasoning to the way the claim was drafted, assuming all factual matters asserted in the complaint were true. See MCR 2.116(C)(8) and (G)(5); see generally *Pawlak v Redox Corp*, 182 Mich App 758, 763; 453 NW2d 304 (1990). Thus, we focus on whether summary disposition under MCR 2.116(C)(10) was appropriate.

Under MCR 2.116(C)(10), a trial court may grant summary disposition if there "is no genuine issue as to any material fact, and the moving party is entitled to judgment . . . as a matter of law." This type of motion tests a claim's factual basis. *Spiek, supra*. Before ruling on the motion, the trial court must consider the pleadings as well as any affidavits, depositions, admissions, and other documentary evidence in the record in the light most favorable to the nonmoving party. MCR 2.116(G)(5); *Ritchie-Gamester v City of Berkley*, 461 Mich 73, 76; 597 NW2d 517 (1999). Although Sobczak and Obetts brought their own motion for summary disposition, they benefit from this favorable view of the evidence because the trial court actually granted the Bank's motion. However, as the nonmoving parties, they still had the burden of producing evidence showing a material dispute of fact in order to survive the Bank's motion under this court rule. MCR 2.116(G)(4); *Etter v Michigan Bell Tele-*

*phone Co*, 179 Mich App 551, 555; 446 NW2d 500 (1989).

The language of the parties' contract—the ship mortgage—is indispensable in resolving this appeal. We apply the long-held rules of contract construction to determine whether the Bank had grounds to repossess the boat under the ship mortgage's default provision. The primary goal in interpreting contracts is to determine and enforce the parties' intent. *Rasheed v Chrysler Corp*, 445 Mich 109, 127, n 28; 517 NW2d 19 (1994). To do so, this Court reads the agreement as a whole and attempts to apply the plain language of the contract itself. *Michigan Twp Participating Plan v Pavolich*, 232 Mich App 378, 383; 591 NW2d 325 (1998), quoting *Royce v Citizens Ins Co*, 219 Mich App 537, 542-543; 557 NW2d 144 (1996); *Dillon v DeNooyer Chevrolet Geo*, 217 Mich App 163, 166; 550 NW2d 846 (1996). However, when a contract is ambiguous, this Court may construe the agreement in an effort to find and enforce the parties' intent. *Zurich Ins Co v CCR & Co (On Rehearing)*, 226 Mich App 599, 607; 576 NW2d 392 (1997). "In interpreting contracts capable of two different constructions, we prefer a reasonable and fair construction over a less just and less reasonable construction." *Schroeder v Terra Energy, Ltd*, 223 Mich App 176, 188; 565 NW2d 887 (1997).

The Michigan Supreme Court deftly described the interplay between the standards for summary disposition and the rules of contract construction when it wrote:

It is axiomatic that if a word or phrase is unambiguous and no reasonable person could differ with respect to application of the term or phrase to undisputed material facts,

then the court should grant summary disposition to the proper party pursuant to MCR 2.116(C)(10). *Moll v Abbott Laboratories*, 444 Mich 1, 28, n 36; 506 NW2d 816 (1993). Conversely, if reasonable minds could disagree about the conclusions to be drawn from the facts, a question for the factfinder exists. *Id.* [*Henderson, supra* at 353.]

### C. DEFINING THE DEFAULT

Although the trial court methodically examined the word "voyages" and attempted to construe its use in the ship mortgage to determine whether Sobczak and Obetts had defaulted under Article I, ¶ 4, we conclude that this focus led the trial court down the wrong analytical path. The relevant portion of the ship mortgage prohibited Sobczak and Obetts from "remov[ing] the vessel from the limits of the United States save on voyages with the intent of returning . . . ." Reading the clause as a whole leads to one inescapable conclusion: the parties to the ship mortgage intended to limit the places to which Sobczak and Obetts could take their boat, i.e., to where they could "remove" it. Generally speaking, they were free to take their boat anyplace in the United States, without limitation. They were, however, prohibited from removing the boat from the United States *except* for "voyages with the intent of returning." The Bank implicitly concedes this point by arguing that the ship mortgage provision relevant here is unambiguously pointed at defining where the owner may take the boat. Because the phrase at issue discusses "removal" from the United States "with" the specified intent, we conclude that the parties agreed that intent at the time the boat was "removed" from the United States was the relevant consideration. In effect, the parties

agreed that the boat could not leave the United States except on voyages *made with the intent* of returning to the United States. Therefore, we conclude that the conditions surrounding the "removal," not whether the boat remained on a voyage, determines whether there was a default.

This focus on removing the boat from the United States as the defining point for this type of default is sensible. On one hand we understand why the Bank would want to protect the collateral for the loan by preventing Sobczak and Obetts from taking or sending the boat to a place where the Bank could not repossess it. On the other hand, limiting how Sobczak and Obetts used their boat, as long as they were not trying to avoid repaying the loan, is unnecessary to protect the Bank's interests. In truth, the Bank has no material interest in how or where Sobczak and Obetts used the boat as long as they did not endanger its value as collateral for the loan. Thus, unlike the Bank, we are not concerned that Sobczak and Obetts might use the boat as a "floating hotel" on a lengthy journey. The size of the boat suggests that it is well equipped to serve this function and, if they intended to return it to the United States, this would be a proper use.

Moreover, the ship mortgage itself does not attempt to prohibit Sobczak and Obetts from taking all actions that might affect whether their boat remained on a "voyage" once they removed it from the United States. There are any number of accidents or uncontrollable events that can occur once a boat leaves port, and the relevant portion of the ship mortgage does not attempt to hold Sobczak and Obetts responsible for a default if the boat is impaired in such a circumstance. For instance, Article I, ¶ 4 does not pre-

vent Sobczak, Obetts, or anyone else from taking the boat out of the United States into weather that might cause it to sink, as long as they intended to return to the United States. Rather, as a whole, ¶ 4 prevents Sobczak and Obetts from taking any action that is *intended* to impair the Bank's rights under the ship mortgage by placing it out of reach for the purpose of repossession. In our view, this is why ¶ 4 also mentions abandonment and operating the boat in an illegal manner, both of which can be interpreted as intentional acts.[2]

For a number of reasons, we conclude that it is somewhat unproductive to examine whether the boat was still on a voyage when the Bank repossessed it instead of examining whether Sobczak and Obetts intended to return to the United States when they started their trip to the Bahamas. *Random House Webster's College Dictionary* (2d ed) defines a "voyage" as "a course of travel or passage, esp[ecially] a long journey by water to a distant place." In effect, the word voyage is a generic term for a trip or journey over water. This definition does not imply a specific duration or distance or the number of segments that might comprise such a trip. Nor does the definition require that a voyage involve continuous movement or limit stops to any particular period or number. In essence, a voyage can be any trip; under the ship mortgage, it can be any trip outside the United States.

---

[2] This distinction between intentional acts to deprive the Bank of its collateral and accidents that might impair that same collateral may stem from the fact that insurance is likely to cover accidental loss but not wrongdoing. In other words, the ship mortgage prevents *intentional* wrongdoing because insurance will cover other types of losses.

It is to the Bank's benefit to use a term that can have a broad meaning when defining what constitutes a default. By using the term "voyages," the ship mortgage covered virtually every type of trip—whether for business, pleasure, sport, illicit purpose, repair, or simple relocation—when describing what constitutes a default. Accordingly, the term "voyages" tells us little about what conduct constitutes a default as distinguished from a perfectly proper trip that might entail a lengthy absence from the United States, a change of plans in midjourney, or an unfortunate delay abroad.

That the word "voyages" says little about what constitutes a default distinguishes this case from those the Bank cites, in which the parties used similar terms in very different ways. For instance, *Bowen v Hope Ins Co*, 37 Mass (20 Pick) 275 (1838), involved two insurance contracts that expired after a year unless the ship was still on a particular voyage when the coverage period expired. *In re Moore*, 278 F Supp 260, 262-263 (ED Mich, 1968), involved a liability limitation that took into consideration the value of the boat or ship during any particular voyage. In both *Bowen* and *Moore*, the courts had to determine whether periods spent repairing a ship could be considered part of the same voyage or if the time spent idle effectively created more than one voyage; connecting the segments of a longer trip was key to determining, respectively, coverage or liability. In this case, however, removing the boat from the United States is the one and only trigger for this type of default (except, of course, if the boat is removed with the intent to return). The term "voyages" in this context is of minimal importance because it is merely a way of describing the act of removing the boat from

the United States.[3] There is no need to connect the various stages of the boat's trip outside the United States because the single act of removing it from this country without the proper intent would be enough to cause a default under the ship mortgage.

In addition, looking solely at whether a boat is on a voyage to determine whether its owners were in default could lead to significant harm to owners who have continued to pay their loans and pose no real threat to the collateral. For example, there may be merit, within the context of a specific agreement, for applying various conditions, such as a period spent in port rather than sailing, to conclude whether a boat is on a voyage.[4] However, without focusing on the owner's intent to return, a lender is free to repossess a boat for a minor interruption of a trip even when there is no risk that the owner will impair the collateral by keeping it outside the United States. We conclude that there simply is no need to depart from the plain wording of the default clause itself to protect a lender.

Further, focusing on the term "voyages" instead of intent blurs the distinction between the separate defaults listed in ¶ 4. For instance, the trial court's analysis flirts with the concept of abandonment in a

---

[3] We see the possibility that other cases may require a different focus on the word "voyages" given its nautical association. For instance, we might be forced to examine whether placing a boat on a truck and driving it to another place is a "voyage." Similarly, there may be other cases when the word "voyages" does have a temporal component due to some particular purpose of language in a contract. We point out these possibilities merely to demonstrate that our interpretation of the word "voyages" in this case is narrow, resting specifically on the language of the parties' contract, and is not intended to apply in all circumstances.

[4] We emphasize that none of these extra conditions are spelled out anywhere in the ship mortgage.

foreign port, which is also a default. It does so by examining the length of time the boat was in the Bahamas and whether Sobczak and Obetts intended to return the boat to the United States after the medical emergency interrupted their plans. However, the Bank has never asserted that Sobczak and Obetts actually abandoned the boat or intended to do so, even though it asserts that there was some evidence that they were going to sell the boat before returning it to the United States.[5] Nor did the actions of Sobczak and Obetts show abandonment or an intent to abandon the boat. Not only did they arrange to store the boat at the marina in the Bahamas during their absence, they returned to the boat in February 1998, they found a captain to return it to the United States, and they continued to make payments on the loan. We observe that these are actions that individuals take when they intend to retain and protect their interest in a piece of property, not to abandon it. See *Random House Webster's College Dictionary* (2d ed) (to abandon means "to leave completely and finally").

In the end analysis, we go back to the language of ¶ 4, which clearly identifies the improper intent never to return to the United States as the trigger for a "removal" default, as opposed to default by abandonment or unlawful conduct. These two concepts, intent and removal, are plainly connected to each other and one without the other will not suffice. In other words, the owner must intend not to return to the United States with the boat *at the time the boat is removed* from the country for this to constitute a removal default. A wrongful intent without removing the boat

---

[5] There is no evidence of this offer or its terms in the trial court record.

from the country is not a default and would not, in any event, jeopardize the Bank's ability to collect the debt.

Similarly, removing the boat from the country while intending to return to the United States and only then deciding later not to return is not a default under the ship mortgage. Practically speaking, removing a boat from the United States can only occur once until the boat reenters the United States, at which time it can be removed again. See *Random House Webster's College Dictionary* (2d ed) (to remove means "to move or shift from a place or position"). There is no practical way to construe the word "remove" as it is used in ¶ 4 to mean that during the entire time a boat is on a voyage outside the United States it is in the constant state of being removed. Moreover, the Bank does not attempt to explain this term at all. We acknowledge that this construction requiring the wrongful intent to exist *at the time of removal* allows owners who remove a boat from the country and only later develop the wrongful intent never to return to escape default and repossession. Yet, a simple language change in the ship mortgage that prohibited removing the boat without the intent to return or developing the intent never to return once on a voyage outside the United States would have closed this loophole. Regardless of which party prepared the ship mortgage, the parties agreed to the terms within it, so we apply them to this case.

### D. APPLICATION

The preliminary evidence in this case is fairly small, because the parties do not dispute that Sobczak and Obetts actually removed the boat from the United

States. Thus, we have searched the record for a factual dispute concerning the intent of Sobczak and Obetts to return *at the time they left Florida* to go to the Bahamas. The only evidence in the record that concerned their intent came from the affidavits of Obetts and McGowan. Those affidavits unequivocally state that they intended to return to the United States when they left the United States. There is no evidence in the record indicating that they actually had other plans or that the medical emergency was some sort of ruse or pretext. Nor does the Bank dispute their intent at the time they removed the boat from the United States. In sum, there was no factual dispute involving their intent and the trial court should have granted summary disposition to Sobczak and Obetts pursuant to MCR 2.116(C)(10).

Reversed and remanded. The trial court shall enter an order granting defendants summary disposition. We do not retain jurisdiction.