*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0184P (6th Cir.)
File Name: 04a0184p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

NETWORKTWO
COMMUNICATIONS GROUP,
INC.,

    *Plaintiff/Counter-*
*Defendant/Appellee,*

    *v.*

SPRING VALLEY MARKETING
GROUP and COMMUNITYISP,
INC.,

    *Defendants/Counter-*
*Plaintiffs/Appellants.*

No. 03-1283

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-72913—Lawrence P. Zatkoff, Chief District Judge.

Argued: April 29, 2004

Decided and Filed: June 18, 2004

Before: KENNEDY, MARTIN, and ROGERS, Circuit
Judges.

---

_____

## COUNSEL

**ARGUED:** Cameron J. Evans, HONIGMAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, for Appellants. Daniel E. Morrisroe, POTTER, DeAGOSTINO, CAMPBELL & O'DEA, Auburn Hills, Michigan, for Appellee. **ON BRIEF:** Cameron J. Evans, HONIGMAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, for Appellants. Steven M. Potter, POTTER, DeAGOSTINO, CAMPBELL & O'DEA, Auburn Hills, Michigan, for Appellee.

_____

## OPINION

_____

BOYCE F. MARTIN, JR., Circuit Judge. CommunityISP, Inc. appeals the district court's award of summary judgment in favor of NetworkTwo Communications Group, Inc. with respect to CommunityISP's breach of contract counterclaim. For the following reasons, we AFFIRM.

### I. *FACTUAL AND PROCEDURAL BACKGROUND*

This dispute arises out of a failed business relationship between CommunityISP, an internet business that specialized in hosting online websites for other companies, associations and organizations, and NetworkTwo, a company that CommunityISP hired to provide internet service to support its operations. The parties entered into a "Master Communications Services Agreement" on August 27, 1998, wherein NetworkTwo agreed to provide internet service to CommunityISP, which CommunityISP would in turn sell to subscribers, or "end users." As part of this agreement, NetworkTwo expressly undertook, among other obligations, to have internet access "available no less than 95.5% of the

time per month" and to upgrade its "dial speeds" from "33.6 kbps" to "56 kbps" "within 60 business days of NetworkTwo's reasonable determination" that 56 kbps is the dial speed that "has been properly established" as the industry standard. For its part, CommunityISP agreed to pay for internet services from NetworkTwo, and also to pay NetworkTwo a $100,000 "commitment fee" pursuant to the following provision in the agreement:

B. Commitment Fee

In addition to any other fees and/or obligations to be paid by [CommunityISP] to NetworkTwo in connection with this Agreement, [CommunityISP] will pay a commitment fee to NetworkTwo in the amount of $100,000.00 in order to partially compensate NetworkTwo for its expenses in developing increased technical and service infrastructure support in anticipation of increased subscription volume caused by [CommunityISP]'s activities involving End Users.

The agreement also provided, however, that in the event that CommunityISP achieved a certain amount of subscribers by a given date, CommunityISP would be entitled to a credit of $100,000:

C. Volume Discounts and/or Penalties

· · ·

If [CommunityISP] has reached a level of 200,000 paid subscribers as described above prior to the expiration of the 24th month, then NetworkTwo shall provide [CommunityISP] a bonus credit in the amount of $100,000 on its first invoice for service following the month in which [CommunityISP] has obtained 100,000 [sic] paid subscribers as described above.

Soon after executing this agreement, the parties' business relationship began to disintegrate. Although NetworkTwo provided internet service to CommunityISP for a few months, it became clear that NetworkTwo would be unwilling or unable to perform all of its obligations under the agreement; for example, it would not upgrade its access speed, nor would it make internet access available 95.5% of the month. Accordingly, CommunityISP hired another internet service provider, SplitRock Communications Group, Inc., to serve as its primary internet service provider, and NetworkTwo was expected to serve as a secondary provider. CommunityISP entered into an internet service agreement with SplitRock that was similar to its earlier agreement with NetworkTwo, and paid Split Rock a $100,000 commitment fee. Additionally, CommunityISP paid $100,000 to a company called NetSurfer, Inc. to create a CD-ROM with the software that CommunityISP customers would need to access the internet. This software was to be provided by NetworkTwo at no additional cost as part of its agreement with CommunityISP. Notably, after CommunityISP and NetworkTwo officially terminated their business relationship in December 1998, NetworkTwo refused to return the $100,000 commitment fee that CommunityISP had paid.

On June 8, 1999, NetworkTwo filed a lawsuit against CommunityISP and its sister company, Spring Valley Marketing Group, seeking damages for unpaid commissions during the time the agreement was in effect. CommunityISP filed counterclaims alleging, among other claims, that NetworkTwo had breached their agreement and caused CommunityISP to suffer in excess of $2.5 million in damages; these damages included the $100,000 commitment fee that CommunityISP paid to Network Two, the $100,000 commitment fee that CommunityISP paid to SplitRock and the $100,000 payment that it made to NetSurfer for the software. NetworkTwo filed two separate motions for summary judgment with respect to CommunityISP's breach of contract counterclaim – the first on June 27, 2000, and the

second on August 21, 2000 – both of which argued that two damage limitation provisions in the parties' agreement precluded recovery of the damages that CommunityISP sought.

The first provision, contained in ¶ 7.C, provides as follows:

NETWORKTWO'S LIABILITY ARISING FROM ANY CLAIM MADE BY CUSTOMER OR ANYONE ELSE RELATIVE TO ANY NETWORKTWO OBLIGATION UNDER THIS AGREEMENT OR RELATING TO NETWORKTWO'S NEGLIGENCE OR RELATING TO ANY OTHER CAUSE OR REASON SHALL BE LIMITED TO AN AMOUNT EQUAL TO THE PRORATED CHARGE TO THE CUSTOMER FOR THE AFFECTED TRANSMISSION. IN NO EVENT SHALL NETWORKTWO BE LIABLE FOR ANY SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, WHETHER OR NOT SUCH DAMAGES WERE FORESEEABLE OR ACTUALLY FORESEEN.

As the district court explained, the phrase "PRORATED CHARGE TO THE CUSTOMER FOR THE AFFECTED TRANSMISSION" means as follows:

The parties anticipated that NetworkTwo would provide internet service to CommunityISP, which would sell that service to the "End Users" or the "Subscribers." The parties contemplated that, at times, the transmission of internet service from NetworkTwo to an End User may become affected, and unsatisfactory to that End User, (or to CommunityISP). In such instances, the End User would most likely look to CommunityISP for a refund equivalent to the time the service was "affected" or unsatisfactory. Since the End User would pay for the service as a monthly charge, the amount to be returned would be prorated over the course of the month as a

percentage of the monthly fee. For example, if CommunityISP charged $30.00 a month to an End User for its service, and the service was down for three days out of thirty, then CommunityISP would return only ten percent of the monthly fee to that End User, or $3.00, as a prorated charge for the affected transmission. CommunityISP would then look to NetworkTwo to reimburse CommunityISP for that charge pursuant to the Agreement.

Neither party has disputed the accuracy of this explanation.

The second provision, contained in Schedule C, ¶ B.2, provides as follows:

In addition to the foregoing, if NetworkTwo fails to substantially meet the network performance standards set forth in section I above for fifteen (15) consecutive days after issuance of a trouble ticket, Customer can notify NetworkTwo in writing that the performance standards are not being met. And describing in detail the deficiency and its likely causes. NetworkTwo will have five (5) days to provide Customer with a reasonable plan to cure network performance issues. NetworkTwo will thereafter have fifteen (15) business days to implement this plan. After NetworkTwo has implemented this plan, if the network statistics fall below the network performance standards in section I above based upon the same deficiency described in the first notice under this section 2, for an additional period of fifteen (15) consecutive days, Customer will as its sole remedy have the option to terminate this agreement by providing NetworkTwo thirty (30) days written notice. In such event, neither party shall have any further obligation to the other.

The district court granted in part NetworkTwo's first motion for summary judgment, holding that the damage

limitation provisions in the agreement were not unconscionable or illusory and were enforceable; the district court clarified, however, that pursuant to ¶ 7.C CommunityISP was entitled to recover only the amount of money that CommunityISP was forced to pay its customers as "PRORATED CHARGE[S]" for "AFFECTED TRANSMISSION[S]," and that pursuant to Schedule C, ¶ B.2 CommunityISP's sole remedy in the event that NetworkTwo had failed to meet network performance standards was termination of the agreement. Shortly after the issuance of the district court's decision, NetworkTwo filed for bankruptcy and the entire action was stayed.

After the stay was lifted on May 17, 2002, the district court granted in full NetworkTwo's second motion for summary judgment and dismissed CommunityISP's breach of contract counterclaim, holding that CommunityISP had failed to prove that it was forced to pay its customers any "PRORATED CHARGE[S]" for "AFFECTED TRANSMISSION[S]" – the only damages that are recoverable under the agreement. According to the district court, the $100,000 commitment fee that CommunityISP had paid to NetworkTwo could not be considered such a "PRORATED CHARGE." Additionally, the district court explained that while the $100,000 commitment fee paid to SplitRock and the $100,000 payment to NetSurfer may have been recoverable under common law damages principles, those damages were barred by ¶ 7.C, which expressly provides that "IN NO EVENT SHALL NETWORK TWO BE LIABLE FOR ANY SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, WHETHER OR NOT SUCH DAMAGES WERE FORESEEABLE OR ACTUALLY FORESEEN." This timely appeal followed.

## II. *ANALYSIS*

The sole issue in this appeal is whether CommunityISP has proven that it suffered damages that are recoverable under the

parties' agreement. We review *de novo* the district court's award of summary judgment in favor of NetworkTwo. *Graham ex rel. Estate of Graham v. Cty. of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004). Michigan law, which the parties agree controls in this diversity case, provides that "[t]he primary goal in interpreting contracts is to determine and enforce the parties' intent." *Old Kent Bank v. Sobczak*, 620 N.W.2d 663, 666-67 (Mich. 2000). To do so, this Court "reads the agreement as a whole and attempts to apply the plain language of the contract itself." *Id.* (citation omitted). "A contract is ambiguous if its words may reasonably be understood in different ways." *UAW-GM Human Res. Ctr. v. KSL Rec. Corp.*, 579 N.W.2d 411, 414 (Mich. 1998) (citation and internal quotation marks omitted). "If the meaning of an agreement is ambiguous or unclear, the trier of fact is to determine the intent of the parties." *Id.* (citation omitted).

CommunityISP propounds two main arguments: first, the damage limitation provisions do not apply; and second, even if they do apply, CommunityISP has suffered damages that are recoverable under those provisions. Each argument will be addressed in turn.

### A. Do the Damage Limitation Provisions Apply?

CommunityISP argues that ¶ 7.C and Schedule C, ¶ B.2 are ambiguous and, therefore, that a jury, not the court, should determine their applicability to this dispute. CommunityISP identifies two alleged ambiguities with respect to these provisions.

The first alleged ambiguity is that ¶ 7.C "assumes that NetworkTwo would be providing services under the Agreement," when in reality, it is alleged, no services were provided. In other words, CommunityISP argues that the provision is ambiguous because it "can reasonably be understood to mean that it provides [CommunityISP] its remedy for NetworkTwo providing substandard services and

not for NetworkTwo providing no services under the Agreement." This attempt to create ambiguity is unpersuasive.

The plain language of ¶ 7.C indicates that the only damages that CommunityISP could recover for any claim against NetworkTwo under the agreement are "LIMITED TO" the "PRORATED CHARGE[S]" that CommunityISP was forced to pay its customers as a result of "AFFECTED TRANSMISSIONS . . . ." The provision further clarifies that "IN NO EVENT SHALL NETWORKTWO BE LIABLE FOR ANY SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, WHETHER OR NOT SUCH DAMAGES WERE FORESEEABLE OR ACTUALLY FORESEEN." CommunityISP may only be able to *recover damages* where NetworkTwo is "providing services" (assuming that CommunityISP is able to meet the other requirements set forth in ¶ 7.C), but there is no basis for CommunityISP's assertion that ¶ 7.C only *applies* in such a situation. We find ¶ 7.C unambiguous in both meaning and application.

Second, CommunityISP argues that ¶ 7.C and Schedule C, ¶ B.2 are ambiguous because they are inconsistent with each other. According to CommunityISP, the provisions are inconsistent because ¶ 7.C provides that NetworkTwo's "liability" under the agreement is "LIMITED TO AN AMOUNT EQUAL TO THE PRORATED CHARGE TO THE CUSTOMER FOR THE AFFECTED TRANSMISSION," but Schedule C, ¶ B.2 provides that the "sole remedy" available to CommunityISP in the event of NetworkTwo's failure "to substantially meet . . . network performance standards" is "the option to terminate this agreement . . . ." This argument also lacks merit.

Although the two provisions do, indeed, provide different remedies, they also address and apply to completely different situations. Paragraph 7.C sets forth the conditions under which NetworkTwo could be held liable for damages under

the agreement, as well as the amount of damages for which it could be forced to pay in the event of liability. Schedule C, ¶ B.2, by contrast, speaks only to the particular situation in which "NetworkTwo fails to substantially meet . . . network performance standards . . . ." The provision sets forth the procedures that are to be followed in the event of such a failure by NetworkTwo, and provides that CommunityISP's "sole remedy" if those procedures are ineffective is "the option to terminate this agreement."

Even assuming that there is some ambiguity as to which remedy is exclusive, there is no ambiguity that benefits CommunityISP. No matter how ¶ 7.C is reconciled with Schedule C, ¶ B.2, there is clearly no room for any remedy other than prorated charges or contract termination. In other words, even if ¶ 7.C permits a remedy that Schedule C, ¶ B.2 appears to preclude, or vice versa, there is no reading of these provisions that permits a remedy other than prorated charges or contract termination. If an ambiguity permits several possible readings of the overall contract, but none of those readings helps CommunityISP, then as to CommunityISP there is simply no ambiguity. The contract unambiguously precludes contract remedies other than prorated charges and contract termination, even if there is some ambiguity as to whether the contract permits the remedies of prorated charges, contract termination, or both or neither of these.

CommunityISP also makes a passing argument that the remedy provided by the damage limitation provision in Schedule C, ¶ B.2 – i.e., termination of the agreement – is "illusory." CommunityISP argues that this provision ultimately provides no remedy at all to CommunityISP because the only remedy it offers is termination of the agreement, which has already been done in this case. The fact that CommunityISP does not like the remedy provided in this particular provision, however, does not render the remedy or the provision illusory. CommunityISP's argument is solely a reflection of its unhappiness with the agreement that it

negotiated at arms length with NetworkTwo, and lacks any basis in fact or law.

### B.  Are CommunityISP's Claimed Damages Recoverable Under the Damage Limitation Provisions?

CommunityISP next argues that even if the damage limitation provisions do apply, CommunityISP has suffered damages that are recoverable under those provisions. As discussed, the only damages that are allowable under the agreement are provided for in ¶ 7.C, as Schedule C, ¶ B.2 only provides for termination of the agreement. Paragraph 7.C states that the only damages that are recoverable under the agreement are "LIMITED TO AN AMOUNT EQUAL TO THE PRORATED CHARGE TO THE CUSTOMER FOR THE AFFECTED TRANSMISSION," and that "IN NO EVENT SHALL NETWORKTWO BE LIABLE FOR ANY SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, WHETHER OR NOT SUCH DAMAGES WERE FORESEEABLE OR ACTUALLY FORESEEN."

CommunityISP argues that the damages that it seeks fall within the category of damages that are recoverable under ¶ 7.C because "when NetworkTwo pulled the proverbial plug on [CommunityISP], all transmissions between [CommunityISP] and NetworkTwo were affected; they ceased. Thus, all of these transmissions were 'affected transmissions.'" CommunityISP conspicuously fails, however, to challenge the district court's determination that CommunityISP had not charged its customers any "PRORATED CHARGE[S]," even though reimbursement for these prorated charges constitutes the only damages to which CommunityISP would be entitled under the agreement. There is simply no indication in the record that CommunityISP charged its customers any "PRORATED CHARGE[S]" for "AFFECTED TRANSMISSION[S]." Therefore, ¶ 7.C precludes CommunityISP from recovering any damages.

### III.  *CONCLUSION*

For the foregoing reasons, the district court's judgment is AFFIRMED.