BUSH v PARMENTER, FORSYTHE, RUDE & DETHMERS

Docket No. 64566. Argued May 5, 1981 (Calendar No. 9).—Decided
June 14, 1982.

Orrin H. Bush, a lawyer, was murdered, apparently in an at-
tempted armed robbery, on a street in Muskegon at about 3:10
a.m. on a Wednesday. Bush had attended a trust and invest-
ment seminar, followed by a cocktail hour, in Grand Rapids on
the Tuesday afternoon before, leaving the seminar at about 6
p.m. After his return to Muskegon he visited two taverns, and
had several drinks, staying in the second tavern until 2:30 a.m.
He then went to a restaurant where he had hamburgers and
coffee and caused some trouble. He refused the offer of employ-
ees of the restaurant to send him home in a cab, and left at
about 3 a.m. He was shot to death a short time later. Yvonne
Bush, his widow, claimed workers' compensation benefits from
his employer, Parmenter, Forsythe, Rude & Dethmers, and its
insurer, St. Paul Fire & Marine Insurance Company, on the
theory that he had been killed in the course of his employment.
A hearing referee found that the death was compensable. The
Workers' Compensation Appeal Board reversed on the ground
that, although Orrin Bush was returning from a business trip
when he was killed, his deviation from the business purpose of
the trip for personal reasons and for an extended period of time
terminated the business nature of the return trip. Following
reversal of its decision and remand by the Court of Appeals,
M. J. Kelly, P.J., and M. F. Cavanagh and Rood, JJ. (Docket No.
29459), the WCAB awarded benefits. The Court of Appeals
denied leave to appeal. The defendants appeal to the Supreme
Court.

In a unanimous opinion by Justice Williams, the Supreme
Court *held:*

The plaintiff's entitlement to workers' compensation benefits
for the death of her husband depends upon whether his devia-
tion from his business trip resulted in the termination of the
business purpose of the trip and placed his subsequent injuries

REFERENCE FOR POINTS IN HEADNOTES
[1-4] 82 Am Jur 2d, Workmen's Compensation § 250.

outside the course of his employment. Where, as in this case, an employee otherwise traveling in the course of his employment deviates during his return trip to so great an extent and in such a manner involving risks unrelated to his business as to dwarf the business portion of the trip, subsequent travel is no longer a circumstance of employment. Thus, injuries sustained following the break in the employment nexus, even though the return trip had been resumed, are not compensable.

Reversed.

79 Mich App 49; 261 NW2d 51 (1977) reversed.

1. WORKERS' COMPENSATION — COURSE OF EMPLOYMENT — BUSINESS TRAVEL.

Travel by an employee engaged in a special mission in the interest of and at the direction of his employer is in the course of his employment, and injuries sustained in that travel are compensable under the workers' compensation act (MCL 418.301; MSA 17.237[301]).

2. MASTER AND SERVANT — COURSE OF EMPLOYMENT — BUSINESS TRAVEL.

The nexus between business travel by an employee and the course of his employment may be broken where the employee so deviates from the purpose of the trip as to dissolve its business character.

3. WORKERS' COMPENSATION — COURSE OF EMPLOYMENT — BUSINESS TRAVEL.

The length and nature of a deviation by an employee during a business trip which extensively departs from the nature of his employment and increases his exposure to the risk or likelihood of injury totally unrelated to the employment is relevant to a determination whether the nexus between the business trip and the employment was broken by the deviation so as to preclude compensation under the Worker's Disability Compensation Act for injuries sustained by the employee subsequent to the deviation (MCL 418.301; MSA 17.237[301]).

4. WORKERS' COMPENSATION — COURSE OF EMPLOYMENT — BUSINESS TRAVEL.

A deviation by an employee during the return course of a business trip which involves hours of activity of an extravagantly personal nature extending beyond the normal workday, and which dwarfs the business purpose of the trip so as to effectively end it, renders subsequent travel outside the circumstance of the employment and dissolves any nexus between the

employment and an injury sustained during resumed travel, precluding compensation under the Worker's Disability Compensation Act (MCL 418.301; MSA 17.237[301]).

*McCroskey, Libner, Van Leuven, Feldman, Cochrane & Brock, P.C. (by Edward M. Welch, Jr.),* for plaintiff Yvonne Bush.

*Smith, Haughey, Rice & Roegge (by Lance R. Mather)* for defendant.

WILLIAMS, J. This case concerns a claim for workers' compensation benefits for the death of an attorney who was killed after a seven- to eight-hour deviation from his return trip home from a trust and investment seminar. We are asked to determine whether decedent's injuries arose out of and in the course of employment where the wage earner, following "a night out on the town", was shot to death after resuming a course which would have taken him to his house. We hold that decedent's deviation was so extensive and involved such added risks totally unrelated to his employment that decedent had broken the employment nexus and thus had ended the business nature of his trip prior to his death. Therefore, we reverse the Court of Appeals decision and vacate the compensation award.

## I. FACTS

Orrin H. Bush, an attorney specializing in probate and estate planning, was a partner with defendant law firm Parmenter, Forsythe, Rude & Dethmers. On Tuesday, October 5, 1971, Bush left his office in Muskegon to attend a trust and investment seminar in Grand Rapids, some 40 miles away. The seminar, offered by Old Kent Bank, lasted from approximately 4 p.m. to 5 p.m., when

the meeting adjourned to an adjoining room for drinks and light snacks provided to the participants by the bank. Bush remained for the cocktail hour, having an estimated two drinks. He left the seminar about 6 p.m. and drove back to Muskegon. The whereabouts of Bush for the next two hours is unknown.[1] At 8:15 p.m., he visited Tony's Club, a restaurant-cocktail lounge in Muskegon Heights,[2] looking for "two or three fellows". Tony Lakos, the owner of the club, noted that Bush did not have anything to drink at his place, nor did the attorney appear to be intoxicated. Bush left Tony's Club immediately after learning that his friends had gone across the street to a nightclub called the Nitehawk.

Bush arrived at the Nitehawk sometime before 8:30 p.m. and remained there until the nightclub closed at 2:30 a.m. Wednesday, October 6. During the six hours at the Nitehawk, Bush had several beers and mixed drinks, danced with two or three women and talked with several patrons.

After the Nitehawk closed, Bush drove east for six or seven blocks to Alice's Restaurant, arriving between 2:30 a.m. and 2:45 a.m. He was described

[1] The 40-mile drive from Grand Rapids to the Muskegon metropolitan area would not have taken 2 hours and 15 minutes. Whether Bush went to a bar in Grand Rapids before returning to Muskegon or stopped along the way is unknown. It is also possible that Bush might have returned to his law office. However, no proof supporting any theory was produced other than the unsubstantiated testimony of Tony Lakos, owner of the first bar Bush was known to have visited, that "[Bush] just got back from Grand Rapids, and he was looking for someone".

[2] Muskegon Heights is a suburb south of Muskegon. The three establishments Bush was known to have visited on the night of his death were all within several blocks of each other in Muskegon Heights. Bush's law office was three or four miles north in downtown Muskegon, while Bush's home was a few miles further north, in North Muskegon. Bush was killed shortly after entering the city limits of Muskegon.

by witnesses there as "ornery and mean". Although no one stated that Bush was staggering or had slurred speech, it was apparent that he had been drinking. Bush ordered and consumed a hamburger and a cup of coffee. In the course of the meal, Bush attempted to pick a fight with another customer and with the 14-year-old dishwasher.[3] He also annoyed a woman patron, despite her requests to be left alone.

Bush also appeared to be forgetful. Upon returning to his seat after the altercation with the customer, he asked the cook for his hamburger and coffee. Despite the fact that Bush had eaten the meal only a few minutes earlier, the cook decided that it would be futile to argue with him, so she cooked a second meal without charge.

Since it was apparent to the employees at Alice's that Bush was in no condition to drive, they tried to get him to take a cab home. At one point they even offered to pay his fare, but he refused. Bush left the restaurant a little after 3 a.m. Wednesday, October 6, 1971.

At approximately 3:10 a.m., Bush was killed in his car three and one-half miles from Alice's Restaurant by a 12-gauge shotgun blast to the right side of his face and head. No one was ever charged with the murder, but the Muskegon Police Department's theory is that Bush was the victim of an attempted armed robbery by one or more un-

---

[3] Bush used abusive language and shoved a customer, a large man who was several inches taller and 70 pounds heavier than the attorney. Similarly, Bush acted hostilely toward the young dishwasher, ordering him to hit Bush's car in order to provide an excuse to beat the boy. The cook had the boy go into the kitchen, and the customer left the restaurant in an attempt to avoid further confrontation. Bush followed the man outside and continued the verbal abuse and shoving until the man drove away.

known assailants. A blood test taken from decedent indicated a 0.21% level of alcohol in his blood at the time of death.

In June 1974, the referee held that, although Bush's actions at the Nitehawk and Alice's constituted a deviation from his employment, the deviation had ended when Bush left Alice's and drove in the direction of his home.[4] "He was finishing his business trip", the referee noted. Therefore, "the death occurred during the course of employment [and] compensation is to be paid".

The Workers' Compensation Appeal Board (WCAB) unanimously reversed in June 1976, holding that the deviation was of such a personal nature and for such an extended period that it terminated the business nature of the return trip home. 1976 WCABO 2962. The Court of Appeals in turn unanimously reversed the WCAB, finding that "[t]he appeal board's somewhat emotional rationale fails to withstand critical analysis". *Bush v Parmenter, Forsythe, Rude & Dethmers,* 79 Mich App 49, 52; 261 NW2d 51 (1977). The Court held that "neither the passage of time nor the nature of the deviation proximately contributed to decedent's fatal wound", *id.,* 55, and remanded the case for a factual determination of whether Bush was returning home when he was shot. We denied leave to appeal. 404 Mich 827 (1979).

On remand, the WCAB confirmed the referee's determination of five years earlier "that decedent was finally on his way home when he was killed" and reluctantly awarded benefits. 1979 WCABO 1356, 1362. We denied defendant's application for

---

[4] The home was used as the end point of the business trip because the seminar had ended at the close of the attorney's normal workday.

leave to appeal prior to decision by the Court of Appeals. 407 Mich 872 (1979). In January, 1980, the Court of Appeals denied leave to appeal in an unpublished memorandum order (Docket No. 45866). We granted leave at 409 Mich 946 (1980).

## II. Issue

This case turns on whether the deviation of decedent Bush was so extensive, in that it lasted for such a long time and incurred substantial increases in danger to decedent unrelated to his employment, that the business character and purpose of the trip dissolved prior to the injury. We hold that the deviation was so extensive that the business character of the return trip had dissolved so that when decedent returned to his homeward course he was no longer in the course of employment.

### III. Return Trip From Seminar Was Within Course of Employment Prior to Deviation

As a prelude to our discussion of the above issue, it might be helpful to review briefly the undisputed facts and establish a legal focal point from which to begin our analysis. As a probate and estate attorney, Bush occasionally found it necessary to attend estate and trust seminars. Defendant law firm encouraged its specialists to attend such seminars and paid for all of the expenses incurred.[5] Defendant received a special benefit

---

[5] Robert L. Forsythe, a senior partner of defendant law firm, indicated defendant's policy concerning the attendance at such seminars.

"*[Plaintiff's attorney]*: Would you tell us whether or not, in the course of the duties for the firm that the various lawyers carried out, they did or were expected to attend educational seminars of the type described?

"*A.* Yes, they would be. Every lawyer, particularly ones that are

from the attendance by its attorneys at these seminars: a work force which was informed of the most recent changes in their specialty and kept up to date on the legal service provided by banks, as well as advertising of the firm's competence and interest in the specialty. By encouraging its attorneys to attend these employment-related, educational seminars, defendant was in effect sending Bush on a special mission. See *LeVasseur v Allen Electric Co,* 338 Mich 121; 61 NW2d 93 (1953); *Stockley v School Dist No 1 of Portage Twp,* 231 Mich 523; 204 NW 715 (1925). *Cf. Mann v Board of Education of City of Detroit,* 266 Mich 271, 273; 253 NW 294 (1934).

Although the general rule of law is that injuries sustained by employees going to and coming from work are not compensable, *Thomas v Certified Refrigeration, Inc,* 392 Mich 623, 631, fn 3; 221 NW2d 378 (1974); *Dent v Ford Motor Co,* 275 Mich

involved in a specialty, are expected to participate in continuing legal education seminars.

\* \* \*

"*Q.* When these seminars were attended by [Bush] or by other members of the firm, would you state whether or not it was the firm's practice to defray any portion of the expense that might be incurred?

"*A.* We would have paid the entire expense involved. The car that he was driving was owned by the firm. The gasoline would have been provided by the firm; and if he had had any additional expense, and entry fee or anything else, this would be paid by the firm, yes."

On appeal, defendant questions whether legal title to the automobile driven and previously owned by Bush had passed to the law firm. There was testimony by Forsythe on cross-examination that "we were in the process of transferring [the title] to the firm, but it was an aborted transfer". However, under these facts the actual ownership of the automobile is immaterial since "[t]he test is whether under the contract of employment, construed in the light of all the attendant circumstances, there is either an express or implied undertaking by the employer to provide the transportation". *Konopka v Jackson County Road Comm,* 270 Mich 174, 177; 258 NW 429 (1935); accord, *Chrysler v Blue Arrow Transport Lines,* 295 Mich 606; 295 NW 331 (1940). See *Pappas v Sport Services, Inc,* 68 Mich App 423, 429; 243 NW2d 10 (1976). The test is satisfied here. See fn 6 *infra.*

39, 41-42; 265 NW 518 (1936); *Hills v Blair,* 182 Mich 20, 26; 148 NW 243 (1914), "this is not the ordinary case of an employee going to and from his work but one where the employee was engaged in a *special mission* in the interest of and at the direction of his employer", *LeVasseur, supra,* 123 (emphasis added).[6] Travel to and from the special mission is in the course of employment and would normally come within the protection of the Worker's Disability Compensation Act. As Professor Larson noted:

"When an employee, having identifiable time and space limits on his employment, makes an off-premises journey which would normally not be covered under the usual going and coming rule, the journey may be brought within the course of employment by the fact that the trouble and time of making the journey, or the special inconvenience, hazard, or urgency of making it in the particular circumstances, is itself sufficiently substantial to be viewed as an integral part of the service itself." 1 Larson, Workmen's Compensation Law, § 16.10, p 4-123 (footnotes omitted).

Therefore, it is undisputed that decedent was

---

[6] While the general rule continues to be that going to and coming from one's employment is not covered under the act, the rule is riddled with exceptions including situations where 1) the employee is on a special mission for the employer, *LeVasseur, supra,* 338 Mich 121; 2) the employer derived a special benefit from the employee's activity at the time of the injury, *Nemeth v Michigan Building Components,* 390 Mich 734; 213 NW2d 144 (1973); 3) the employer paid for or furnished employee transportation as a part of the contract of employment, *Chrysler, supra,* 295 Mich 606; 4) the travel comprised a dual purpose combining the employment-required business needs with the personal activity of the employee, *Burchett v Delton-Kellogg School,* 378 Mich 231; 144 NW2d 337 (1966); 5) the employment subjected the employee to "excessive exposure to the common risk" such as traffic risks faced by a truck rider deadheading to his rig, *Chrysler, supra,* 609, quoting *Cudahy Packing Co v Parramore,* 263 US 418, 425; 44 S Ct 153; 68 L Ed 366 (1923); and 6) the travel took place as a result of a split shift working schedule, *Howard v Detroit,* 377 Mich 102; 139 NW2d 677 (1966), or employment requiring a similar irregular nonfixed working schedule, *Wilhelm v Angell, Wilhelm & Shreve,* 252 Mich 648; 234 NW 433 (1931).

within the course of his employment traveling to, attending and returning from the Grand Rapids seminar. The question remains, however, whether decedent was still in the course of his employment after completing a seven- to eight-hour deviation within a few miles of his home.

## IV. THE EMPLOYMENT NEXUS MAY BE BROKEN

In reversing the original WCAB ruling denying benefits, the Court of Appeals held:

"[U]nder the circumstances of this case *the nature of the deviation has no relevant connection with decedent's untimely demise.* Whether decedent spent eight hours, from the end of the seminar until resuming his trip home, in pursuit of 'Bacchanalian pleasures', or instead spent those hours engaged in more laudable conduct, such as by improving his mind in the public library or redeeming his soul at a religious institution of his choice, has no relationship to the circumstances or cause of his death.

"Our decision might, of necessity, be different if decedent died as a result of drunk driving, for then his arguably wrongful conduct, becoming drunk in the service of his employer, would be the proximate cause of his death and it is well established that under such circumstances compensation may be denied. *Crilly v Ballou,* 353 Mich 303, 327; 91 NW2d 493 (1958). *Nor do we find the mere passage of time controlling or even particularly relevant.* Except in unusual circumstances not here present, the timing of the trip bears no relationship to its hazards, and it is the general hazards which allow liability for injury to be imposed on the employer in the first place. *Stark v L E Myers Co,* 58 Mich App 439, 443; 228 NW2d 411 (1975), *lv den* 394 Mich 814.

"Under the rule of *Stark, supra, because decedent was engaged in a trip of special benefit to his employer, it is his employer who must bear the risk for one complete round trip.* Deviations from the business route

may or may not be covered, a question we do not here decide, but *upon resumption of* the trip out or *the return trip the employer's liability recommences."* (Emphasis added.) 79 Mich App 53.

We agree that the character of the deviation, except in its relation to business or to the increase in risk of injury, is immaterial.[7] However, to the extent that the deviation either increased the exposure or the likelihood of injury to the worker or departed from the nature of the employment, the nature and length of the deviation is relevant.

The Court of Appeals appears to be relying on a strict and rigid rule: *"because* decedent was engaged in a trip of *special benefit* to his employer, it is his employer who must bear the risk for *one complete round trip.* * * * [U]pon resumption of the * * * return trip the employer's liability recommences." *Id.* The length and nature of the deviation is immaterial, the Court of Appeals stated, so long as the employee has returned to the path leading to the original destination. If claimant has ended his deviation and is subsequently injured, that Court would ipso facto hold the employer liable.

This Court rejected such a rigid analysis in *Thomas v Certified Refrigeration, Inc, supra,* 392 Mich 633, fn 4, where we noted:

"[T]his Court will not follow the path taken by some courts in other jurisdictions which have granted or denied compensation based on rigid rules such as whether the personal mission was completed and the employee was returning to the business route."

_____
[7] As we noted in *Thomas, supra,* 392 Mich 637:

"[Workers'] compensation, like the gentle rain from heaven, falls upon the just and unjust alike so long as the injury arose out of and in the employment ambience."

While the example given to illustrate this principle was a situation where this Court affirmed compensation for a delivery boy even though he was injured while on an insubstantial detour, *Beaudry v Watkins,* 191 Mich 445; 158 NW 16 (1916), the principle works equally well in avoiding a rigid rule in favor of compensation. Indeed, we so held in the following paragraph of *Thomas, supra,* 634-635:

"We do not suggest that every authorized use of a company-owned vehicle or deviation from a business route will fall within this triad of cases. *[Burchett v Delton-Kellogg Schools,* 378 Mich 231; 144 NW2d 337 (1966); *Howard v Detroit,* 377 Mich 102; 139 NW2d 677 (1966); and *Beaudry, supra.]* An authorized but totally private excursion such as using the company vehicle for weekend personal errands certainly is not covered because such trips lack a dual purpose required by *Burchett* or 'a sufficient nexus between the employment and the injury' required by *Nemeth. If a personal business detour is so great that the deviation dwarfs the business portion of the trip, it no longer can be said that it is 'a circumstance of [the] employment' as required by Howard."*

Nor is this view unique to Michigan. See, *e.g., Alford v Quality Chevrolet Co,* 246 NC 214, 217; 97 SE2d 869 (1957) (five-hour night on the town after work by employee furnished with company car "shows abandonment of employment rather than deviation"); *Calloway v State Workmen's Compensation Comm'r,* 268 SE2d 132 (W Va, 1980) (salesman's "tavern hopping" following several business-related calls held to be a substantial deviation ending course of employment); *Johnson v McGehee Brothers Furniture Co,* 256 So 2d 741 (La App, 1972) (salesman, who had no fixed work hours, killed in company car at 1 a.m. while driving

home after five hours at a cafe and bar held outside course of employment), *writ refused* 260 La 1132; 258 So 2d 380 (1972); *Hebrank v Parsons, Brinckerhoff, Hall & MacDonald,* 88 NJ Super 406, 420; 212 A2d 579 (1965) (11-hour deviation with supervisor in employer's car 25 miles away from job site held to be total abandonment of employment; returning from deviation when injured held immaterial); *Carter v Burn Construction Co, Inc,* 85 NM 27; 508 P2d 1324 (Ct App, 1973) ("grease monkey" killed while driving employer's truck after 4-1/2-hour deviation drinking beer and playing pool; held to be so major a deviation that subsequent return to homeward journey failed to return him to scope of employment), *cert den* 85 NM 5; 508 P2d 1302 (1973); *Owen v Oneida, Ltd,* 16 AD2d 1005; 229 NYS2d 325 (1962) (sociable drinking until 2:30 a.m. following a chance dinner meeting with a customer noncompensable); and *O'Connell v State Accident Ins Fund,* 19 Or App 735; 528 P2d 1064 (1974) (14-hour "evening out on the town" following completion of business portion of a trip held outside course of employment). The majority view is summarized by Professor Larson:

"Any business mission that begins as such from a particular base, such as the employee's home or office, must contemplate both an outgoing and a returning trip.

"However, the fact that the employee frequently is indeed free to go where he pleases and [d]o what he pleases after the last business chore is completed gives rise to a class of exasperating, complicated and sometimes picturesque fact problems involving employees who, had they gone straight home, would have been entitled to have their homeward journey covered, but who interpolated so many personal diversions between the last business act and the journey home that the ultimate journey home has often been held to have lost

its business character somewhere along the line. The case of Mr. Dooley is typical. *[Dooley v Smith's Transfer Co,* 26 NJ Misc 129; 57 A2d 554 (NJ Workmen's Compensation Bureau, 1948)]. Having the right to travel to and from work at company expense in his own car, he left work at 4:30 p.m., had a few beers, went to the movies, and then was not heard from until he struck a traffic island on his way home at 2 a.m. Although there was no evidence that the accident was due to intoxication, compensation was denied because of the 'unreasonable interval'.

"This kind of case does not generate a set of clear and profound workmen's compensation principles to explain why compensation is denied in some such cases and awarded in others. One thing seems reasonably certain. *An employee who has the right to have his homeward journey covered cannot, so to speak, put that right in the bank indefinitely and cash it at whatever future time suits his convenience. The sheer amount of time elapsed is bound to influence courts in these cases. * * * Other factors * * * include the amount of risk added by the personal activities, such as drinking, the nature of the job, and the extent to which there may be found an identifiable moment in time at which work duties end and the clock begins to run on the deviation."* 1 Larson, Workmen's Compensation Law, § 19.29, pp 4-310—4-320 (footnotes omitted and emphasis added).

Thus, merely because Bush was killed after ending his all-night detour does not necessarily mean that he is entitled to benefit. It is possible to break the employment nexus and end the special mission prior to the completion of the "round trip". We must therefore examine the facts to determine whether the business purpose of the return trip was destroyed by the nature and extent of Bush's deviation.

## V. The Nature and Extent of the Deviation

Bush left the seminar cocktail reception at ap-

proximately 6 p.m. Tuesday, October 5, 1971, and presumably headed directly toward Muskegon. (See fn 1 and accompanying text, *supra.*) It should have taken decedent an hour more or less to travel the 40 miles of expressway from Grand Rapids to Muskegon. The record is silent as to the whereabouts of Bush until he entered Tony's Club in Muskegon Heights at 8:15 p.m. However, for approximately the next seven hours, decedent was engaged in activity totally unrelated to his employment. Furthermore, he had left his employment-related locale almost 40 miles behind him and was within a few miles of home.

When Bush left Alice's Restaurant shortly after 3 Wednesday morning, he was again headed in the direction of his home. We find that the WCAB's affirmance of the referee's finding that "the evidence establishes that decedent was finally on his way home when he was killed", 1979 WCABO 1356, 1362, is supported by the record.[8]

The question remains whether the employment nexus continued to exist after such a substantial deviation. The WCAB believed that the nexus was broken and that any business purpose originally existing had dissolved:

*"The deviation (if it be called that) involved here was of such a grossly temporal and extravagantly personal nature as to totally overshadow and eliminate whatever business purpose may have remained to the trip.* * * *

---

[8] Defendant's argument that the finding is unsupported by the record and unexplained by the bureau is meritless. The referee found:

"[A]t the time of his murder the deceased was on an acceptable route between the I-96 & US 31 intersection and his home. * * * [W]hen he turned north on Getty shortly before his death he was back on the route he deviated from * * * and closer to his business destination (his home) than he had been at any time after leaving Grand Rapids on 10-5-71".

[W]e do not think that this is really properly considered a deviation case when viewed in this light. The notion that the business mission involved here opened such floodgates as to give decedent the employment-related right to go off on his own for hours upon returning to his home base area in pursuit of bacchanalian pleasures, and in the early morning hours of the next day when he decides to start the last leg of his journey home then re-enter the course of his employment, is so outrageous and fundamentally unreasonable as to be thoroughly ludicrous. *Decedent's conduct upon returning to Muskegon not only dwarfed whatever may have remained of the business purpose of the trip but effectively ended it and his workday."* 1976 WCABO at 2962-2963. (Emphasis added.)

We agree.

This is not a situation in which decedent made a brief stop at the bar after his work mission to have one or two drinks before resuming his travel. Decedent had traveled almost 40 miles home before he spent the rest of the night drinking. His deviation lasted for seven to eight hours, while the seminar was only an hour long plus a two- to three-hour round trip. If Bush had gone directly home or back to his office after the seminar, he should have arrived back in Muskegon around 6:00 to 6:30 p.m. (or 7:00 to 7:30 p.m. if he had gone directly back following the cocktail hour sponsored by the bank) during daylight hours. As it was, he began the last leg of his journey home at 3 a.m. in the dark of night through a high crime area while intoxicated and in a belligerent mood.[9] To say that

_____

[9] It is interesting to note that MCL 257.625a(1); MSA 9.2325(1) states that a person is presumed to be operating a motor vehicle while impaired if he or she had over 0.07% blood-alcohol ratio and to be operating a motor vehicle while intoxicated if the blood-alcohol ratio is 0.10% or higher. Decedent's blood-alcohol ratio was 0.21%.

Captain Arnold Van Dam, the Muskegon police officer in charge of the homicide investigation, observed that the area where Bush was killed "is a shaded area" where "we were besieged with many armed robberies".

this did not substantially increase the likelihood of injury is to ignore reality. To find that such conduct did not "dwarf the business portion of the trip" or break the employment-injury nexus is to create a rule which could never be applied. We decline to do either and hold that, as a matter of law, decedent's extended night out on the town after he had almost reached home terminated the business purpose of the trip so that when Bush was killed Wednesday morning he was not covered by the act.

## VI. CONCLUSION

The plaintiff's decedent's business detour was so great and unrelated to his business that the deviation dwarfed the business portion of the trip. The deviation was of such nature and length that it extensively increased the likelihood of injury and was clearly unrelated to the purpose of the employment. The business portion of the trip, under the facts of this case, had thereby terminated prior to the tragic occurrence. The ultimate journey home had lost its business character. Consequently, the subsequent travel was no longer "a circumstance of [the] employment" as required by *Thomas* and *Howard.* Thus, any nexus between the employment and the injury was dissolved.

The decision of the Court of Appeals is reversed, and the award is vacated. No costs, a public question being involved.

COLEMAN, C.J., and KAVANAGH, LEVIN, FITZGERALD, RYAN, and BLAIR MOODY, JR., JJ., concurred with WILLIAMS, J.