# STATE OF MICHIGAN

# COURT OF APPEALS

GREAT WEST CASUALTY COMPANY,

        Plaintiff/Counterdefendant-
        Appellee,

v

PROGRESSIVE CASUALTY INSURANCE
COMPANY,

        Defendant/Counterplaintiff/Cross-
        Plaintiff-Appellant,

and

GEORGE ARNAOUT, RONALD GLENN
BARKLEY, PAMELA DENISE BARKLEY,
BARKLEY TRUCKING, EXP, LLC, and XPO
EXPRESS, INC.,

        Defendants/Cross-Defendants.

UNPUBLISHED
December 13, 2018

Nos. 338617; 339612
Wayne Circuit Court
LC No.   15-009936-CK

Before:  M. J. KELLY, P.J., and METER and O'BRIEN, JJ.

PER CURIAM.

Plaintiff/counterdefendant, Great West Casualty Company (Great West), filed this declaratory action against defendant/counterplaintiff/cross-plaintiff-appellant, Progressive Casualty Insurance (Progressive), to determine responsibility to provide insurance coverage in connection with an automobile accident.[1]  The trial court granted Great West's motion for

---

[1] The defendants/cross-defendants (other defendants) in this action—George Arnaout, Ronald Glenn Barkley, Pamela Denise Barkley, Barkley Trucking, XPO Express, Inc., and EXP, LLC— are persons or entities involved in or connected to the underlying accident.  Great West and Progressive appear to agree that the other defendants have no interest in this case.  Progressive advises that the other defendants were only named "because they had technical or theoretical interests in [the] outcome" of this case.

summary disposition, denied Progressive's motion for summary disposition, directed Progressive to reimburse Great West for the latter's costs in defending earlier litigation, and awarded Great West costs and attorney fees. We affirm in part, reverse in part, vacate in part, and remand for further proceedings.[2]

## I. FACTS

The underlying facts are not in dispute. Defendant Barkley Trucking consists of defendants Ronald and Pamela Barkley, and their tractor. Express-1, an earlier incarnation of defendants XPO Express, Inc., and EXP, LLC, contracted with the Barkleys for trucking services. Under 49 CFR 376.12(c)(1), their lease was required to grant "the authorized carrier lessee . . . exclusive possession, control, and use of the equipment for the duration of the lease," and "the authorized carrier lessee" was to "assume complete responsibility for the operation of the equipment for the duration of the lease." In conformity with this regulation, the agreement between Express-1 and Barkley Trucking states that "[t]o the extent required by regulatory authorities . . . Express-1 shall have exclusive possession, control and use of the Equipment during the term of this Agreement." While operating under that agreement, the Barkleys delivered a loaded trailer to a location in Woodhaven, Michigan. The Barkleys then drove the empty trailer to a local Walmart, where Ronald detached it. Ronald then "bobtailed"—meaning drove his tractor with no trailer attached—Pamela to a coin-operated laundry facility and dropped her off. While bobtailing back to the laundry facility to pick Pamela up, Ronald collided with defendant George Arnaout, who suffered injuries. Arnaout later brought an action against Express-1 and Ronald (the *Arnaout* litigation).

Great West insured Express-1 under a policy providing broad coverage, including "the financial responsibility requirements of . . . the Motor Carrier Act of 1980."[3] See CFR 387.301(a) (requiring interstate carriers to maintain security to cover "any final judgment . . . for bodily injuries to or the death of any person resulting from the negligent operation, maintenance or use of motor vehicles in transportation"). Barkley Trucking had an insurance policy with Progressive that covered the tractor when it was not being used for business. Progressive denied Ronald coverage in the *Arnaout* litigation because Progressive believed that the tractor was being used in Express-1's trucking business when the accident occurred. As a result, Great West provided for the defense and other coverage of both Express-1 and Ronald.

During the *Arnaout* litigation, the trial court issued an order granting summary disposition to Express-1 because, according to the trial court, Ronald was not operating the tractor in furtherance of Express-1's business at the time of the accident. The trial court based

---

[2] In Docket No. 338617, Great West contests whether this Court has jurisdiction because, according to Great West, the order appealed in that case is not a final order. But Great West's argument is moot because it concedes that the order appealed in Docket No. 339612 is a final order, so this Court has jurisdiction to review that order as well as any earlier non-final orders, including the order appealed in Docket No. 338617.

[3] 49 USC 10101 *et seq.*

this finding on the undisputed fact that the trailer was not attached to the tractor when the accident occurred. Because Express-1 was not otherwise the owner of the tractor under MCL 257.37, the trial court concluded that Express-1 was not vicariously liable for Arnaout's damages. The trial court further declared that Progressive "must defend and indemnify Defendant Ronald Barkley," and directed Progressive to "pay for all actual costs and attorney fees incurred by Great West in connection with the defense of Ronald Barkley and Express 1 Transportation." A subsequent order in *Arnaout* directed Ronald to "file a third party complaint against Progressive with all allegations relative to the claims and coverage." But before Ronald could do so, Progressive—while continuing to deny responsibility for coverage—took over Ronald's defense and settled with Arnaout. The parties in *Arnaout* then stipulated to dismiss Ronald from the case, and the court entered an order reflecting that stipulation and closing the case.

Before the trial court dismissed Arnaout's claim against Ronald and after the trial court ordered Ronald to file a third-party complaint against Progressive, Great West commenced the instant declaratory action seeking reimbursement from Progressive for its costs in defending Ronald and Express-1. Progressive counterclaimed, seeking a declaratory judgment in its favor because, among other reasons, it contended that it had no duty to defend or indemnify either Ronald or Express-1 in the *Arnaout* litigation, and that Great West was required to indemnify Progressive for any costs that the latter might incur in defending or settling the *Arnaout* case. The parties filed cross-motions for summary disposition, which the trial court decided in Great West's favor. In so doing, the trial court gave deference to its conclusions in *Arnaout* that Ronald was not operating the tractor in furtherance of Express-1's business at the time of the accident, and that Progressive—not Great West—had an obligation to defend and indemnify in the matter.

## II. INSURERS' OBLIGATIONS

Both parties sought summary disposition under MCR 2.116(C)(10) (failure to establish a genuine issue of material fact), and Great West also sought summary disposition under MCR 2.116(C)(8) (failure to state a claim) and (C)(9) (failure to state a valid defense). This Court reviews de novo a trial court's decision on a motion for summary disposition. *Ardt v Titan Ins Co*, 233 Mich App 685, 688; 593 NW2d 215 (1999). When reviewing a motion for summary disposition under MCR 2.116(C)(10), this Court examines all documentary evidence in the light most favorable to the nonmoving party to determine whether there exists a genuine issue of material fact. *Id*. "A motion for summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of a claim by the pleadings alone." *Smith v Stolberg*, 231 Mich App 256, 258; 586 NW2d 103 (1998). In reviewing a (C)(8) motion, this Court accepts as true all factual allegations in the claim "to determine whether the claim is so clearly unenforceable as a matter of law that no factual development could establish the claim and justify recovery." *Id*. A motion under MCR 2.116(C)(9) should likewise be decided only on the pleadings. *Attorney General v City of Flint*, 269 Mich App 209, 211; 713 NW2d 782 (2005).

## A. PRECLUSION DOCTRINES

Great West argues that the trial court correctly respected its rulings from the *Arnaout* litigation because res judicata or collateral estoppel precluded relitigation of those issues.

Progressive argues that those doctrines were inapplicable because neither Progressive nor Great West was a party in the *Arnaout* litigation. The applicability of a legal doctrine is a question of law that we review de novo. *James v Alberts*, 464 Mich 12, 14; 626 NW2d 158 (2001).

"Under the doctrine of res judicata, 'a final judgment rendered by a court of competent jurisdiction on the merits is conclusive as to the rights of the parties and their privies, and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand or cause of action.'" *Wayne Co v Detroit*, 233 Mich App 275, 277; 590 NW2d 619 (1998), quoting *Black's Law Dictionary* (6th ed, 1990), p 1305. "The doctrine operates where the earlier and subsequent actions involve the same parties or their privies, the matters of dispute could or should have been resolved in the earlier adjudication, and the earlier controversy was decided on its merits." *Wayne Co*, 233 Mich App at 277. Res judicata thus bars claims predicated on disputes that were, or could have been, decided in earlier litigation.

The related doctrine of collateral estoppel "bars relitigation of an issue in a new action arising between the same parties or their privies when the earlier proceeding resulted in a valid final judgment and the issue in question was actually and necessarily determined in that prior proceeding." *Leahy v Orion Twp*, 269 Mich App 527, 530; 711 NW2d 438 (2006), citing 1 Restatement Judgments, 2d, § 27, p 250. In contrast to res judicata, "[c]ollateral estoppel conclusively bars only issues 'actually litigated' in the first action." *VanDeventer v Mich Nat'l Bank*, 172 Mich App 456, 463; 432 NW2d 338 (1988).

In addressing whether preclusion doctrines prevented relitigation of the issues decided in the earlier *Arnaout* litigation, the trial court referred to the pertinent order in *Arnaout* as a "valid order" with "full force and effect," which had not been subject to a motion for reconsideration or appeal. The court stated that "there is no basis for Progressive's policy not to be in effect and the Court previously did articulate its position in the motions for summary disposition that were discussed in [the *Arnaout* litigation] and the Court would incorporate all of its arguments in that summary disposition as well." The court further elaborated:

> [T]he insured of Progressive, Mr. Barkley was involved in the prior action and there has to be—if the insured or their privies or anyone related to them, they are bound by the actions and the Court feels that initially, in the first instance, we shouldn't be here because the Court had already made the ruling on these issues of summary disposition but the Court indicated, file the dec[laratory] action and we'd see it through. So, that being said, Progressive really does step in the shoes of Mr. Barkley, in terms of what had transpired, because Mr. Barkley was clearly the insured . . . of Progressive at the time of this incident. He had a valid policy. It was in full force and effect. . . . [A]s I indicated, . . . Progressive was the proper party to pay for the Arnaout claims in the earlier case and . . . this should not be imputed to Great Western [sic]. Additionally, . . . the relief requested by Great West, in this situation, was to be reimbursed for all costs associated with the litigation of this matter. . . .

\* \* \*

> . . . [T]he Court notes that it had . . . time and time again, . . . attempted to get Progressive in this case, on numerous occasions, by numerous means, . . . and then the Court ultimately issued an order to get Progressive in . . . . [Progressive's counsel] did a yeoman's job . . . in ultimately resolving this case, but the Court does order that the interest be paid on these claims, the total of $154,244.64, back to the date of this Court's order when it had indicated that they were to pay . . . .

Although the court also engaged in considerable discussion whether Ronald was operating in the service of Express-1 when the collision with Arnaout took place, the court's repeated and emphatic references to its decisions in *Arnaout* indicate that it was treating them as settled for present purposes. It appears that the court engaged in additional discussion of the pertinent issues only because counsel drew the court into reiterating its original reasoning. The court showed no inclination to reconsider its earlier rulings for either procedural or substantive reasons.

We hold that collateral estoppel barred relitigation of the court's determination in *Arnaout* that Express-1 was not responsible for Arnaout's injuries,[4] leaving Express-1's insurer—Great West—with no client to indemnify. But we also hold that neither res judicata nor collateral estoppel preclude relitigation of the instant parties' respective contractual obligations to provide a defense in that case.

As an initial matter, we note that the trial court's complaints at having tried without success to bring Progressive into the earlier *Arnaout* litigation—and especially its having ordered Ronald to file a third-party complaint against Progressive in that case—failed to consider that Progressive was statutorily barred from becoming a party in Arnaout's negligence action against Ronald and Express-1. See MCL 500.3030 ("In the original action brought by the injured person, . . . the insurer shall not be made or joined as a party defendant . . . ."). For that reason, the earlier *Arnaout* litigation was the proper vehicle for determining issues of negligence and damages, but the later declaratory action was the proper vehicle for determining the respective insurers' obligations.

---

[4] Progressive argues that because *Arnaout* ended with a "consent judgment" resulting in the dismissal of Ronald, all earlier rulings in that case were rendered moot and ineffectual, and thus not part of a final judgment for purposes of preclusion doctrines. But the order dismissing Ronald only reflected the parties' stipulation in that regard; it did not actually or impliedly address the determinations that Express-1 had no liability because Ronald was not acting in furtherance of Express-1's business when the accident occurred, or that Progressive was contractually obligated to Ronald in the matter. Indeed, the court took pains to acknowledge on the record that its determination that Progressive was responsible for Ronald's defense survived the settlement with Arnaout and stipulation to dismiss Ronald. For these reasons, we reject Progressive's argument that those aspects of the *Arnaout* litigation became inoperative after Ronald was dismissed and the case was closed.

Even so, there was substantial privity between the instant parties and their respective insureds in the underlying *Arnaout* litigation. "Privity between a party and a non-party requires both a substantial identity of interests and a working or functional relationship in which the interests of the non-party are presented and protected by the party in the litigation." *Phinisee v Rogers*, 229 Mich App 547, 553-554; 582 NW2d 852 (1998) (quotation marks, citations, and ellipsis omitted). Substantial identity, and not necessarily perfect identity, of parties is sufficient. See *Dearborn Hts Sch Dist No. 7 v Wayne Co MEA/NEA*, 233 Mich App 120, 124, 126; 592 NW2d 408 (1998). Both the identity of interests and a functional relationship between Great West and Express-1, as insurer and insured, in avoiding tort liability in the underlying *Arnaout* litigation are obvious. Also apparent is the identity of interests between Progressive and Ronald in preferring that the latter not face sole responsibility for Arnaout's injuries, an interest that Progressive could have better promoted had it more aggressively exercised its prerogative—if not duty—to undertake Ronald's defense. We further note that Great West invoked collateral estoppel defensively, so the mutual privity requirement is somewhat relaxed. See *Monat v State Farm Ins Co*, 469 Mich 679, 680-681; 677 NW2d 843 (2004); *Wilcox v Sealey*, 132 Mich App 38, 46; 346 NW2d 889 (1984). We therefore conclude that collateral estoppel barred relitigation of the trial court's determination in *Arnaout* regarding the tort liability between Ronald and Express-1. In particular, collateral estoppel barred relitigation of the trial court's ruling that Express-1 was not liable to Arnaout because Ronald was not driving his tractor in furtherance of Express-1's business.[5]

Yet, especially in light of MCL 500.3030's prohibition of the insurers' direct participation in Arnaout's negligence action against Ronald and Express-1, the question of the insurers' respective contractual obligations in the matter was not properly litigated or decided in *Arnaout*, so the trial court's determination that Progressive alone was responsible for the costs of defending the two defendants was not a matter *necessarily* decided in that case for purposes of collateral estoppel. In other words, the court was attending to the issues properly before it in deciding the extent of the *Arnaout* defendants' obligations to Arnaout—including its determination that Express-1 had none—but to the extent that the court was drawn into and endeavored to determine questions of insurer liability, it was acting beyond the scope of the controversy before it. And as pointed out by Progressive, there was no privity between Progressive and Ronald in *Arnaout* regarding Progressive's contractual duty to provide coverage for Ronald; indeed, with Express-1—and therefore Great West—no longer involved in the litigation, Progressive's and Ronald's respective interests regarding Progressive's contractual duties were decidedly adverse. And no other party participating in the bulk of *Arnaout* was in privity with Progressive; no party in that case had an incentive to contest a finding that Progressive was responsible for coverage. For these reasons, neither res judicata nor collateral

---

[5] Progressive contends that its constitutional due process rights are violated if it is bound by an order from a case that it was not a party to. See US Const, Am XIV, § 1; Const 1963, art 1, § 17. But because Progressive's insured and privy, Ronald, was a party, there is no dispute that Progressive had notice of the proceedings in *Arnaout*. And because Progressive refused to exercise its prerogative to provide Ronald's defense in *Arnaout* until the two months before the latter's dismissal by stipulation, Progressive's argument is unpersuasive.

estoppel precluded Progressive from challenging the trial court's determination in *Arnaout* that Progressive, and only Progressive, was contractually obligated to defend Ronald in that litigation.[6]

## B. CONTRACTUAL COVERAGE

In light of Progressive's settlement with Arnaout on Ronald's behalf, neither Ronald's negligence in causing the collision with Arnaout nor the extent of Arnaout's resulting injuries remains at issue. And because we have concluded that collateral estoppel prevents the parties from relitigating Express-1's liability, we reiterate that Great West is left with no party to indemnify. Yet still at issue are the parties' respective obligations to cover the costs of defending the underlying *Arnaout* litigation.

This Court reviews de novo issues of contract interpretation. *Sands Appliance Servs, Inc v Wilson*, 463 Mich 231, 238; 615 NW2d 241 (2000). The primary goal in contract interpretation is to ascertain and effectuate the intent of the parties. *Old Kent Bank v Sobczak*, 243 Mich App 57, 63; 620 NW2d 663 (2000). To determine the parties' intent, this Court reads the contract as a whole and attempts to apply its plain language. *Id.* Where the contractual language is not ambiguous, its construction is a question of law for the court. *Id.* at 63-64.

The contract between Barkley Trucking and Express-1 specifies that Express-1 is arranging for the services of "an independent contractor," and that "neither Subcontractor nor its

---

[6] Great West characterizes Progressive's attempts to avoid preclusion doctrines as improper collateral attacks on earlier judicial determinations. But preclusion doctrines reflect the "general rule . . . that the proceedings of a court can be attacked collaterally [only] if the court never acquired jurisdiction of the subject matter or the persons involved." *Life Ins Co of Detroit v Burton*, 306 Mich 81, 85; 10 NW2d 315 (1943) (quotation marks and citation omitted). A component of both subject-matter and personal jurisdiction is *operational* or *procedural* jurisdiction, for which the inquiry is whether the pertinent procedural law authorizes the court to exercise its jurisdiction under the circumstances. See Stephens, *Florida's Third Species of Jurisdiction*, 82 Fla B J 10, 22 (March 2008) (noting that inquiry into a court's subject-matter and personal jurisdiction in a particular case includes inquiry into "whether the applicable procedural law affords the court a green light to proceed under the circumstances," and advocating recognition of "procedural jurisdiction as a distinct species"). That claim preclusion by operation of res judicata, or issue preclusion by operation of collateral estoppel, may be invoked against only parties or their privies in the earlier adjudication necessarily means that a party is free to collaterally attack judicial determinations of that party's rights or responsibilities from an earlier case in which the court failed to exercise proper jurisdiction over that party. See also *Workers' Compensation Agency Dir v MacDonald's Indus Prod, Inc (On Reconsideration)*, 305 Mich App 460, 476; 853 NW2d 467 (2014) ("only void decisions are subject to collateral attack"); *State Treasurer v Eaton*, 92 Mich App 327, 331; 284 NW2d 801 (1979) ("A taxpayer's failure to contest a property tax assessment by direct appeal precludes collateral attack on the amount of the assessment, but does not necessarily preclude collateral attack on the validity of the assessment.").

employees or personnel are employees of Express-1." It further specifies that "the leased equipment is 'engaged in providing transportation services [on] behalf of Express-1' only upon completion of loading, and thereafter proceeding under actual load while carrying cargo to completion of delivery." The agreement obligates the subcontractor to obtain liability insurance for "all use of the subcontracted Equipment when not engaged in providing transportation services to Express-1."

To satisfy this obligation, the Barkleys obtained insurance from Progressive.[7] The policy's renewal declarations page describes a "Non-Trucking Liability to Others." Progressive's argument that it was not responsible for defending in *Arnaout* relies on an endorsement in the renewal declarations setting forth the following exclusion:

> Coverage . . . , including our duty to defend, does not apply to an Insured auto or any attached trailer while operated, maintained, or used:
>
> a. To carry property or while such property is being loaded or unloaded from the insured auto or an attached trailer; or
>
> b. In any business or for any business purpose.

There is no dispute that when the subject accident took place, Ronald was not using the vehicle to carry, load, or unload property; at issue is whether Barkley was nonetheless operating or using the vehicle "[i]n any business or for any business purpose" relating to Express-1.[8]

Progressive acknowledges that the Barkleys obtained the subject policy "in an attempt to satisfy a contractual obligation to Express-1," but asserts that "the coverage afforded under the policy does not mirror the terms of said contractual obligation." Progressive suggests that actual coverage under the policy was limited to such situation as "if the Barkleys were bobtailing to work before a tour of duty, or bobtailing home from the terminal after one," or if "Ronald Barkley drove the tractor from his house to the store and back." We do not join Progressive in interpreting the coverage obligation so narrowly.

"Where the language of a contract is clear and unambiguous, the intent of the parties will be ascertained according to its plain sense and meaning." *Haywood v Fowler*, 190 Mich App 253, 258; 475 NW2d 458 (1991). While the various parts of a contract should be read together, see, e.g., *JAM Corp v AARO Disposal, Inc*, 461 Mich 161, 170; 600 NW2d 617 (1999),

---

[7] We are mindful that Progressive's obligations under its policy with Barkley Trucking are purely a function of the contract between Progressive and Barkley Trucking, regardless of the particulars of Barkley Trucking's agreement with Express-1, or the terms of the policy between Express-1 and Great West.

[8] The trial court's earlier and binding determination that Ronald was not operating in furtherance of Express-1's business for purposes of deciding the latter's vicarious tort liability to Arnaout is not necessarily dispositive of whether Ronald was operating in or for any business for purposes of bringing this contractual exclusion to bear.

exclusions limiting insurance coverage should be read independently, *Hawkeye-Security Ins Co v Vector Constr Co*, 185 Mich App 369, 385; 460 NW2d 329 (1990). "[C]overage under a policy is lost if any exclusion within the policy applies to an insured's particular claims." *Auto-Owners Ins Co v Churchman*, 440 Mich 560, 567; 489 NW2d 431 (1992).

Again, because the issue of tort liability was settled in the earlier litigation, what remained at issue was the parties' contractual duty to defend. "[T]he duty to defend is broader than the duty to indemnify." *American Bumper & Mfg Co v Hartford Fire Ins Co*, 452 Mich 440, 450; 550 NW2d 475 (1996). Thus, "[i]f the allegations of a third party against the policyholder even arguably come within the policy coverage, the insurer must provide a defense. This is true even where the claim may be groundless or frivolous." *Id.* at 450-451 (citations omitted).

The parties do not disagree over the pertinent facts or the interpretation of the exclusionary language at issue. Instead, they disagree whether the facts bring that exclusion to bear.

To support its argument that Ronald was operating in the service of Express-1 while bobtailing to a laundry facility to pick up his wife, Progressive relies on *Freed v Travelers*, 300 F2d 395 (CA 7, 1962). In that case, a truck tractor was deemed to be operating in furtherance of the carrier's business when its driver got into an accident while bobtailing en route to having the tractor repaired after completing a delivery. *Id.* at 397-398. Progressive similarly relies on *Hartford Ins Co v Occidental Fire & Cas Co*, 908 F2d 235 (CA 7, 1990), in which a tractor was deemed operating in furtherance of the carrier's business when its driver got into an accident while bobtailing on personal business while awaiting repairs on the trailer, the need for which had interrupted a delivery. *Id.* at 236-237. Both of these federal cases[9] are distinguishable from the instant case; they involved a driver who was bobtailing while their respective equipment was being repaired in furtherance of the respective carriers' business. In contrast, Ronald had completed a job for Express-1 when he elected to disconnect the trailer for reasons wholly unrelated to Express-1's business, and then was bobtailing on purely personal business.

Progressive also cites *Bush v Parmenter, Forsythe, Rude & Dethmers*, 413 Mich 444; 320 NW2d 858 (1982), for the proposition that personal activity otherwise unrelated to one's work may be deemed part of the job when taking place as part of a "special mission" to operate at a location of significant physical distance from one's home or normal workplace. In *Bush*, the Court observed:

> "When an employee, having identifiable time and space limits on his employment, makes an off-premises journey which would normally not be covered under the usual going and coming rule, the journey may be brought within the course of employment by the fact that the trouble and time of making the journey, or the special inconvenience, hazard, or urgency of making it in the

---

[9] "Although lower federal court decisions may be persuasive, they are not binding on state courts." *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

particular circumstances, is itself sufficiently substantial to be viewed as an integral part of the service itself." [*Id.* at 452, quoting 1 Larson, Workmen's Compensation Law, § 16.10, p 4-123 (footnotes omitted).]

But *Bush* offers little instruction for how this case should be resolved. Not only is it a workers' compensation case involving an employer-employee relationship—rather than the leasing or subcontracting agreement at issue here—but it also involved an employer sending an employee, exceptionally, away from the normal workplace on a "special mission." *Bush*, 413 Mich at 451. Here, the relationship between the parties' respective insureds envisioned interstate trucking from the start. There was nothing "special" about the Barkleys using their tractor for personal errands unrelated to Express-1's business while they were on the road.

In contrast to the cases cited by Progressive, we find instructive *Engle v Zurich-American Ins Group*, 216 Mich App 482; 549 NW2d 589 (1996). That case concerned an accident that took place while a truck driver was bobtailing en route to the carrier's location, after having left a trailer with the carrier's customer and thinking his day's work was over, and then taking a dinner break. *Id.* at 484. The bobtail insurance policy in that case "excluded coverage '[w]hile the automobile is being used in the business of any person or organization to whom the automobile is rented.' " *Id.* at 485. This Court noted that various jurisdictions have differed over whether exclusions of that sort applied when a truck is being used after the driver has completed their assigned deliveries. *Id.* at 486. This Court concluded that the exclusion was susceptible to "more than one reasonable interpretation," and so construed it against the insurer and in favor of coverage. *Id.* at 487.

The exclusion at issue here—barring coverage for a vehicle "operated . . . or used . . . [i]n any business or for any business purpose"—might be considered similarly ambiguous with respect to a trucker's bobtailing back to the carrier between jobs, but no such ambiguity is apparent in connection with Ronald's leaving Express-1's empty trailer at a location unrelated to Express-1's business and then bobtailing on clearly personal errands. In *Engle*, the driver's "parking his truck at the yard was coincidentally a matter of convenience" for the driver, but "also benefited" the carrier "because it permitted the truck to be ready for use at any time." *Id.* at 485. And that the driver "stopped at the yard every night . . . allowed for the two way exchange of information between trucker and carrier, a fact which also indicates a business purpose." *Id.* If that amount of business purpose still called for resolving against the insurer an ambiguous exclusion for a use "in the business of any person or organization to whom the automobile is rented," the plainly lesser business purpose attendant to Ronald's picking up his wife from the laundry facility militates all the more against application of the exclusion for a vehicle used "[i]n any business or for any business purpose."

For these reasons, Progressive has failed to show that the trial court erred in holding that the exclusion on which Progressive relied did not apply, and so Progressive was obligated to provide Ronald a defense throughout the underlying *Arnaout* litigation.

## C. GREAT WEST'S OBLIGATION TO DEFEND

The conclusion that Progressive had an obligation to defend Ronald does not determine whether Progressive had a like obligation to Express-1. And even if Progressive did have a duty

to defend Express-1, that does not necessarily relieve Great West of any duties it may have had under its contract with Express-1.

As noted, Great West may invoke defensive collateral estoppel to preclude relitigation of the trial court's determination in the *Arnaout* litigation that Great West's insured, Express-1, had no liability to Arnaout. And because any duty Great West might have had to Ronald was derivative of its duties to Express-1, the determination in *Arnaout* that Express-1 had no liability to Arnaout relieved Great West of any duty to indemnify. But this is not determinative of Great West's duty to defend because the duty to defend is broader than the duty to indemnify. See *American Bumper*, 452 Mich at 450.

Great West invested in defending Express-1, as well as Ronald as Express-1's agent, and the trial court apparently ruled that Progressive was responsible for the entire cost of this defense. Progressive's position is that "while the lease was in effect and the [tractor] was being used for a business purpose, only Great West had coverage," but "while the lease was in effect and the [tractor] was not being used for a business purpose, both Great West and Progressive had coverage." This position has merit.

Express-1, as an interstate carrier contracting with Barkley Trucking for transportation services, came under substantial federal regulation. As stated earlier, 49 CFR 376.12(c)(1) requires a carrier to contract for "exclusive possession, control, and use of the equipment for the duration of the lease," and also to "assume complete responsibility for the operation of the equipment for the duration of the lease." And Express-1's policy with Great West guaranteed commensurate coverage. But 49 CFR 376.12(j) does permit parties to agree to apportion liability between themselves by means of additional insurance, and it expressly mentions "bobtail insurance." If such arrangements are made, they are "supplemental to the lessee's obligation to provide coverage at all times the lease is in effect," and "[t]he existence of additional insurance funds affects only the ultimate distribution of liability, a subject on which the regulations are indifferent." *Hartford Ins Co*, 908 F2d at 238.

In *Engle*, after interpreting the insurance contract against the bobtail insurer in favor of coverage, this Court's majority was satisfied for procedural reasons not to concern itself with the possibility that the carrier's insurer also had obligations in the matter. *Engle*, 216 Mich App at 488. The partial dissent opined that the panel should have determined whether coverage existed under both policies. *Id.* at 489 (O'CONNELL, J., concurring in part and dissenting in part). Our Supreme Court ultimately agreed with the partial dissent and remanded the case to this Court with instructions to determine whether there was coverage under the policy issued by the carrier's insurer. *Engle v Zurich Ins Group*, 455 Mich 866 (1997). On remand, this Court answered that question in the affirmative and remanded the case to the trial court for further proceedings. *Engle v Zurich Ins Group (On Remand)*, 230 Mich App 105, 107, 110-111; 583 NW2d 484 (1998).

For these reasons, we reverse in part and remand this case to the trial court with instructions to apportion responsibility for Ronald's and Express-1's defense in the underlying *Arnaout* case in light of the instant parties' respective and possibly overlapping contractual obligations. *Engle*, 455 Mich at 866; *Hartford Ins Co*, 908 F2d at 238. See also *Zurich-American Ins Co v Amerisure Ins Co*, 215 Mich App 526, 531; 547 NW2d 52 (1996) ("We

disagree with the parties' suggestion that a finding of coverage under one policy necessarily implies a lack of coverage under the other policy. Rather, the extent of Zurich's and Amerisure's insurance obligations is governed by the terms of each of their individual policies.").

## III. ATTORNEY FEES AND COSTS

Our decision to reverse in part and remand for the reasons discussed in Part II requires that we also vacate the trial court's award of attorney fees and costs pursuant to MCR 2.405, and obviates our need to address Progressive's procedural objections to that award.

Affirmed in part, reversed in part, vacated in part, and remanded for further proceedings consistent with this opinion. No taxable costs, neither party having prevailed in full. We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Patrick M. Meter
/s/ Colleen A. O'Brien